JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellant, William Hudson, appeals his conviction in the Cuyahoga County Court of Common Pleas on two counts of attempted murder and two counts of felonious assault, each with corresponding notice of prior conviction, repeat violent offender, and firearm specifications, and one count of having a weapon while under disability. For the reasons stated herein, we affirm.
 {¶ 2} Hudson was indicted on two counts of attempted murder, two counts of felonious assault, two counts of aggravated robbery, and one count of having a weapon while under disability. Each of the first six counts had a notice of prior conviction, repeat violent offender specification, and one-and three-year firearm specifications. Hudson entered not guilty pleas to the charges.
 {¶ 3} Hudson waived his right to a jury trial on the notice of prior conviction and repeat violent offender specifications, as well as to the charge of having a weapon while under disability. A jury trial commenced on January 31, 2007.
 {¶ 4} The pertinent facts adduced at trial are as follows. In the early morning hours of February 23, 2006, Genaro Claudio, the victim in this case, was shot six times. He testified that he was shot by William Hudson, who was known to Claudio as "Billie."
 {¶ 5} Earlier that night, Claudio and Hudson had both attended a family-reunion type of party. Claudio testified that he left the party between 2:00 a.m. and 2:45 a.m., and that Hudson asked him for a ride. Claudio stated that he agreed and drove Hudson to the area of W. 32nd Street and Bradwell Avenue, where Hudson *Page 4 
told him to stop. Claudio testified that Hudson then pointed a revolver to Claudio's head and told him, "I'm going to kill you because you hit me with a bottle."
 {¶ 6} Claudio stated that Hudson mistakenly believed that he had hit him on the head with a beer bottle a couple months earlier; however, he claims it was actually his cousin who had hit Hudson with the bottle. He also testified that he was told by his aunt of rumors that Hudson was going to kill him. Despite this, Claudio agreed to give Hudson a ride that night. Claudio indicated that Hudson was dressed mostly in black and had on a black baseball hat.
 {¶ 7} Claudio testified that as he observed Hudson pulling the trigger back, he grabbed Hudson by the wrist and was shot in the stomach. A struggle ensued during which the two exited the vehicle, and Claudio was shot several more times. Ultimately, Claudio was able to run away, while being shot from behind. He continued to hop away, jump a fence, and hide under the porch of a house. Claudio testified that Hudson passed by, still threatening to kill him, and then went away. Claudio went door to door until someone called the police for him. He was taken to the hospital.
 {¶ 8} Officer Michael Simon responded at 3:20 a.m. to the area where the shots had been heard. He observed a silver car parked on the side of the road, with its lights on, engine running, and driver's door open. He noticed a bullet nick in the steering wheel and a bullet hole in the driver's door, and he found a spent bullet fragment. *Page 5 
 {¶ 9} Officer Simon was the reporting officer on the case and prepared the initial police report. He met with Claudio at the hospital, and Claudio told him that he did not want any police involvement and that he would handle the matter on his own. Upon further questioning, Claudio told Officer Simon that "Billie" had shot him and provided a description.
 {¶ 10} Officer Raymond O'Connor responded to the area of the shooting to look for the suspect, whose description had been broadcast. He observed an individual on foot who roughly matched the description, and pursued him. The suspect went over a fence, and the officer lost sight of him. Prior to going over the fence, the suspect dropped a hat that was recovered and was found to have a bullet hole in it. A five-shot revolver was also recovered in the area; later testing determined it was not the firearm used to shoot Claudio.
 {¶ 11} William Holloway testified that he resides on Bradwell Avenue and heard gunshots on the night of the incident. He observed a car parked in the street with the door open and nobody inside. He also saw a "guy wearing a black leather jacket, shaved head" who was looking around at the ground "like he had dropped something." He then saw the man moving away at a "hurried pace." He testified that he thought the man was Caucasian and was shorter than Holloway. Testimony at trial revealed that Hudson was the same height as Holloway. However, Holloway stated he could not provide a good description and did not get a good look at the *Page 6 
person's face. Holloway stated he was about "75 feet away from the guy standing in between the houses." Holloway spoke to the police when they arrived.
 {¶ 12} Hudson was arrested several weeks later at the home of Joseph Wente. When the police arrived at Wente's home, Wente denied that Hudson was there. The police looked around the house and found Hudson under a couch. Wente was arrested and charged with obstruction of justice.
 {¶ 13} Wente and Hudson were taken to jail together and placed in neighboring cells. Wente indicated that Hudson told him what had happened, including that the victim had hit Hudson with a bottle, that the two were fighting again, that Hudson shot the victim several times, and that Hudson dropped a hat that might have had a gunshot hole in it. Within two or three days of learning of the events from Hudson, Wente spoke to a detective. Wente stated that he decided to testify because he learned that "there was a defense being built that was going to try to put it on me, that I shot a guy I've never met before." He claimed to have learned this only a couple months prior to trial.
 {¶ 14} Garrett Satterfield was a pod mate with Hudson in September 2006. He claimed that Hudson informed him that Claudio had hit him over the head with a bottle, that Hudson and Claudio were at a family gathering together and Hudson asked Claudio for a ride, and that he shot Claudio. Satterfield testified to further details that Hudson purportedly told him. He indicated that Hudson had obtained a copy of the police report and had told Satterfield that "stuff was messed up and he *Page 7 
thought he could beat the case." Satterfield made a statement to Detective David Borden in September. Satterfield admitted that he was facing burglary charges when he testified in this case.
 {¶ 15} Detective David Borden testified that he was assigned to investigate the case. Borden interviewed Sherry Coon and Antonio Gonzalez, both of whom had attended the party on the night of the shooting. He found neither of them cooperative. He testified that he learned general time frames regarding their attendance at the party, but that they could not "lock anything down." Detective Borden obtained various leads on Hudson. He testified to the details of Hudson's arrest. In relation to the five-shot revolver that had been recovered, Detective Borden was asked whether he was familiar with a "drop gun." The detective testified that it is "another gun that somebody carries on them and drops at the scene of a crime or wherever."
 {¶ 16} Following the state's case, several witnesses were called on behalf of the defense. Sherri Coon and her four children all testified that they were at the party. The children testified that Hudson was driving behind them on their way to the party and that when they left the party, Hudson followed them part of the way home in a greenish gray car. Coon and a couple of the children each testified that they left the party at "3:23 a.m." There was also testimony that Hudson was wearing a beige and white "Ecco coat." Coon testified that Hudson followed them all the way to Dead Man's Curve and then beeped as they went separate ways. *Page 8 
 {¶ 17} On cross-examination, the prosecutor asked Coon if she told the detective, who was taking notes, that she did not see Hudson leave. Coon denied this. The prosecutor proceeded to reference statements made to the detective by Coon's husband, Antonio Gonzalez, including "he didn't really see Billie" and that they "left somewhere around 4:00."
 {¶ 18} Gonzalez did not testify as a witness. Claudio had testified that his cousin Antonio Gonzalez was "saying something different" and Claudio told him to "stay away from this."
 {¶ 19} The state called Jesus Claudio, the victim's uncle, on rebuttal. Jesus testified that as he was leaving the party, Claudio and Hudson left at the same time. He stated that Claudio and Hudson were talking, and they both got into Claudio's car together. Jesus also indicated that Hudson was wearing a black leather jacket at the party.
 {¶ 20} On February 7, 2007, the jury returned guilty verdicts on both counts of attempted murder, both counts of felonious assault, and on all corresponding firearm specifications. The jury found Hudson not guilty on the two counts of aggravated robbery. The trial court found him guilty of having a weapon while under disability, and of the repeat violent offender specification and notice of prior conviction on each of the attempted murder and felonious assault counts. The trial court imposed a total combined sentence of imprisonment of twenty-four years. The court also added a one-year consecutive sentence for a community control violation on a prior case. *Page 9 
 {¶ 21} Hudson has appealed his convictions and has raised five assignments of error for our review. His first assignment of error provides as follows: "The appellant was denied his constitutional right to a fair trial under the Sixth and Fourteenth Amendments because of prosecutorial misconduct at trial and during closing argument."
 {¶ 22} The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. State v.Smith (1984), 14 Ohio St.3d 13, 14. The touchstone of the due process analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209, 219. To determine prejudice, the effect of the prosecutor's misconduct must be considered in light of the whole trial. State v. Frazier, 115 Ohio St.3d 139, 164,2007-Ohio-5048; State v. Durr (1991), 58 Ohio St.3d 86, 94.
 {¶ 23} Hudson argues that the prosecutor in this case referenced matters not in evidence during the trial. Specifically, he complains about the prosecutor's inquiry into statements made by Coon and her husband, Antonio Gonzalez, to the detective, and references to the police report, which was not in evidence. The record reflects that Coon testified that she saw Hudson all night at the party and that he left when they did at 3:23 a.m. The prosecutor sought to impeach this testimony by referencing the police report and asking Coon about statements made to the detective about not having seen Hudson after he arrived at the party, the time frame *Page 10 
when she and her husband left, and not having seen Hudson leave. As trial counsel did not object, we review for plain error.
 {¶ 24} In State v. Cody, Cuyahoga App. No. 77427, 2002-Ohio-7055, this court stated the following: "When questioning a witness for impeachment purposes, a party may refer to facts not in evidence so long as the method of impeachment is otherwise allowed and there is a reasonable basis to imply the existence of the impeaching fact. Extrinsic evidence of the impeaching fact is admissible if the evidence shows bias, sensory defect, or specifically contradicts the witness's testimony and is also admissible by Evid.R. 608(A), 609, 613, 616(A), 616(B), or 706." (Footnotes omitted.) Our review shows that the prosecutor was questioning Coon with facts that were not in evidence. With respect to the alleged statements of Antonio Gonzalez, he did not testify in this matter and the prosecutor could not use his hearsay statements to impeach Coon's testimony. See Cody, supra; Evid.R. 607.
 {¶ 25} The prosecutor was permitted to question Coon with the alleged prior inconsistent statements that she made to the detective without introducing the police report pursuant to Evid.R. 613(A).[1] As stated in State v. Minor (1988), 47 Ohio App.3d 22, paragraph two of the syllabus: *Page 11 
 "Where, upon cross-examination, the examiner confronts the witness with an alleged prior inconsistent statement, and the witness denies having made such a statement, there is no requirement that extrinsic evidence be introduced to establish the existence of the statement unless there is an indication that the impeaching question was posed without a good faith belief that such an inconsistent statement had been made. Rather, where a witness denies having made the prior inconsistent statement, impeachment is complete upon introduction of extrinsic evidence of such statement. If no evidence of the prior statement is adduced, however, there is simply no evidence before the court to impeach the witness' testimony, and the jury should be cautioned that statements by counsel which are unsupported by the evidence are not to be considered."
 {¶ 26} Here, Coon denied making the alleged statements to the detective. Because the prosecutor did not introduce extrinsic evidence of the statements, he was stuck with Coon's answer and could not impeach her testimony. We find no misconduct in this regard. However, the trial court should have issued a cautionary instruction to disregard the unsupported allegation concerning the prior statements.
 {¶ 27} In any event, we do not find that plain error occurred because even if Gonzalez's hearsay statements had been excluded and a cautionary instruction given as to Coon's statements, the remaining evidence shows the outcome of the trial would not have been any different.
 {¶ 28} Detective Borden testified that he interviewed both Coon and Gonzalez and that he found neither of them cooperative. He also testified that he learned only general time frames regarding their attendance at the party and that they could not "lock anything down." This testimony clearly implied that no specific time of 3:23 a.m. *Page 12 
was provided to Detective Borden. Further, Coon denied the suggestion that she did not see Hudson leave. Her testimony was also consistent with the testimony provided by her children. Finally, in light of the whole record, the jury had substantial other evidence on which to rely for its determination, including the ability to compare the victim's and the defendant's versions of events, as well as corroborating testimony.
 {¶ 29} Next, Hudson refers to comments made by the prosecutor during closing arguments. We recognize that parties are granted wide latitude in closing arguments. State v. Smith, 97 Ohio St.3d 367, 377,2002-Ohio-6659. Further, the question as to the propriety of these arguments is generally left to the sound discretion of the trial court.State v. Maurer, 15 Ohio St.3d 239, 266. Here again, insofar as counsel did not object to the alleged improper statements, Hudson waived all but plain error.
 {¶ 30} Hudson argues that the following comments by the prosecutor during his closing argument were improper:
 "I don't see many reasons to not believe the fundamental parts of what [the victim] said here, a gun was placed to his head, he was robbed at gunpoint."
 {¶ 31} And,
 "Why would you say it was [Hudson] if it was someone else? That's completely ridiculous. I can't — I can't fathom that argument." *Page 13 
 {¶ 32} We find nothing improper concerning the first statement as the facts pointed to were established. With respect to the second statement, the court gave the following curative instruction: "Mr. May's interpretation of the evidence or his personal opinion as to what he can fathom or not fathom is no consequence to the jury. The jury makes the decision as to the credibility of the witnesses, the weight to be given to the testimony in this matter." We must assume that the jurors followed the court's instructions in this regard.
 {¶ 33} Hudson also claims the prosecutor improperly commented on matters not in evidence during his closing argument, including that Sherri Coon had told the detective, "We only saw him once, didn't see him again." As with the presentation of the evidence itself, however, we do not find that this comment deprived Hudson of a fair trial in light of the entire record.
 {¶ 34} Hudson next refers to comments made by the prosecutor regarding the testimony of Satterfield consisting of matters not contained in the police report. Our review reflects that the prosecutor reviewed portions of Satterfield's testimony detailing Hudson's confession. The prosecutor commented that several of the details provided by Satterfield were "not in the report." However, on cross-examination, Satterfield was questioned as to whether his memory stopped with the information in the police report. Satterfield responded: "No. The stuff that I went over with in the police report that he had showed me and other stuff that I gave in my statement are stuff that I gave in my statement that there's no way I could have *Page 14 
known unless he had told me." Also, many of the details testified to by Satterfield were provided by other witnesses in the case.
 {¶ 35} Further, insofar as references were made to what was or was not "in the report," the transcript reflects that Officer Simon, the officer who prepared the initial report, testified that he was aware that other officers were chasing a potential suspect, and that he was advised that they had recovered a baseball-type cap, a bloody shirt, and a revolver with some spent rounds in it. Officer Conner later testified to further details pertaining to the chase and the objects recovered. We also note that insofar as reference was made to the report, the trial court specifically instructed the jury that the "closing arguments of the parties do not constitute evidence." In any event, we do not find that the comments by the prosecutor in this regard prejudiced Hudson's right to a fair trial.
 {¶ 36} Finally, Hudson claims that in order to motivate Wente to testify in this matter, the prosecutor informed Wente that Hudson would blame the shooting on him if he did not testify. He also argues that the prosecutor unfairly tried to prejudice him at sentencing by stating "[H]e would do it again, if he can get away with it and probably try to go after Garrett Satterfield and Joseph Wente." Here again, we are not persuaded that the prosecution violated Hudson's right to a fair trial.
 {¶ 37} After reviewing the record in its entirety to determine whether prejudicial error occurred, we conclude that the few improper statements made by the *Page 15 
prosecutor did not prejudice Hudson's right to a fair trial. Hudson's first assignment of error is overruled.
 {¶ 38} Hudson's second assignment of error provides as follows: "Appellant's right under the Sixth and Fourteenth Amendments to confront the witnesses against him [was] violated when numerous instances of testimonial hearsay were introduced against him at trial."
 {¶ 39} Hudson argues that the testimony concerning "rumors" that Hudson wanted to kill Claudio consisted of improper hearsay statements and violated his right to confront witnesses against him. The transcript reflects that Claudio testified that he received a call from his aunt telling him that she heard rumors that Hudson wanted to kill him. An objection was made and was sustained by the trial court. Also, defense counsel later revisited the issue and asked Claudio on cross-examination about the rumors he heard from his aunt.
 {¶ 40} The Confrontation Clause to the United States Constitution provides that a defendant in a criminal prosecution has a right to confront the witnesses against him. The United States Supreme Court has held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify and the defendant had a prior opportunity for cross-examination." Crawford v. Washington (2004), 541 U.S. 36, 53-54. "The key inquiry for Confrontation Clause purposes is whether a particular statement is testimonial or nontestimonial." State v.Crager, 116 Ohio St.3d 369, 2007-Ohio-6840. *Page 16 
"For Confrontation Clause purposes, a testimonial statement includes one made `under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, quoting Crawford, 541 U.S. at 52.
 {¶ 41} In this case, we do not find that the aunt's statement regarding the rumors was testimonial. At the time the statement was made, the crime had not even been committed and the aunt was making the statement for purposes of warning the victim. We do not find that the circumstances would lead an objective witness reasonably to believe the statement would be used at a later trial. Accordingly, we find no Confrontation Clause violation.
 {¶ 42} Insofar as Hudson argues that the rumor statements were improper hearsay and should have been excluded, we do not find that the statements unfairly prejudiced Hudson, as other evidence of motive was introduced. The jury heard testimony from the victim himself that Hudson was the shooter, that he had told Claudio "I'm going to kill you because you hit me with a bottle," and that he continued to threaten to kill Claudio as he hid under the porch. Accordingly, Hudson's second assignment of error is overruled.
 {¶ 43} Hudson's third assignment of error provides as follows: "The appellant was denied his rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments when the court erred by admitting a great amount of enormously prejudicial testimony against him at trial." *Page 17 
 {¶ 44} Hudson points to various instances where he claims unfairly prejudicial testimony was introduced against him. Under Evid.R. 401, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A).
 {¶ 45} Under this assignment of error, much of the testimony that Hudson claims was improperly admitted against him was clearly proper. Hudson complains of testimony concerning threatening statements purportedly made by Hudson from prison against Claudio and various potential witnesses in the case. He also points to testimony concerning Hudson's intent to blame Wente for the shooting. This testimony was clearly relevant to the issue of guilt, and the probative value was not substantially outweighed by the danger of undue prejudice.
 {¶ 46} Hudson next refers to Detective Borden's testimony that the FBI knew who Mr. Hudson was and provided the detective with information to locate Hudson. A review of the transcript reflects that the detective was responding to questioning concerning how he was able to learn who "Billie" was and locate him. This was admissible evidence. *Page 18 
 {¶ 47} Hudson also refers to Claudio's testimony that Hudson carried the same revolver on the night that he was hit by a bottle, and actually pulled it out during the fight. Here again, we find this was admissible evidence.
 {¶ 48} Finally, Hudson refers to testimony that he was incarcerated for domestic violence following the shooting, and that he had some outstanding warrants at the time of the shooting. We recognize that these matters were uttered in the course of Detective Borden's testimony concerning his investigation to locate "Billie." Satterfield also uttered during his testimony that Hudson was on parole at the time of the shooting. Although such references were not relevant to the matter at hand, we do not find that they amounted to reversible error.
 {¶ 49} We are mindful that a trial court and attorneys are not able to control every utterance that a witness makes during trial. Reversible error is not necessarily created by simply allowing improper testimony to be presented and admitted. We find no unfair prejudice in this matter; therefore, Hudson's third assignment of error is overruled.
 {¶ 50} Hudson's fourth assignment of error provides as follows: "The appellant was denied his right under the Sixth and Fourteenth Amendments to the effective assistance of counsel when defense counsel failed to protect his rights during trial."
 {¶ 51} In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that (1) the performance of defense counsel was seriously flawed and deficient, and (2) the result of the appellant's trial or legal *Page 19 
proceeding would have been different had defense counsel provided proper representation. Strickland v. Washington (1984), 466 U.S. 668; State v.Brooks (1986), 25 Ohio St.3d 144. In evaluating whether a defendant has been denied his right to effective assistance of counsel, the ultimate query is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, paragraph four of the syllabus. Judicial scrutiny of defense counsel's performance must be highly deferential.Strickland, 466 U.S. at 689. In Ohio, there is a presumption that a properly licensed attorney is competent. State v. Calhoun,86 Ohio St.3d 279, 1999-Ohio-102.
 {¶ 52} Hudson claims that his trial counsel failed to object to harmful prosecutorial misconduct, unreliable hearsay statements, and unfairly prejudicial testimony. He further states that his trial counsel failed to request any limiting or curative instruction to mitigate the effect of this evidence. Hudson refers to much of the matter discussed in the previous assignments of error. However, as already found, much of the evidence referred to was admissible, and where error did occur, it did not amount to unfair prejudice or reversible error and did not deprive Hudson of his right to a fair trial. We find that Hudson has failed to demonstrate a claim for ineffective assistance of counsel and overrule his fourth assignment of error.
 {¶ 53} Hudson's fifth assignment of error provides as follows: "The jury's decision finding the appellant guilty of the charges was against the manifest weight of the evidence." *Page 20 
 {¶ 54} In reviewing a claim challenging the manifest weight of the evidence, the question to be answered is whether "there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Leonard, 104 Ohio St.3d 54, 67,2004-Ohio-6235 (internal quotes and citations omitted).
 {¶ 55} Hudson argues that "the jury's verdict was against the manifest weight of the evidence when the story told by the victim did not make sense, was not supported by any physical evidence and was only buttressed by the testimony of two `snitches,' both of whom had a reason to lie." Hudson points to some of the inconsistencies and contradictions in the testimony provided, along with the lack of physical evidence. He further questions the credibility of the state's witnesses.
 {¶ 56} Our review of the record reveals no manifest miscarriage of justice in this case. The evidence in this case established that Claudio had been shot. Claudio testified that Hudson was the person who shot him, and he testified to Hudson's motive for the shooting. Claudio's description of Hudson as being dressed mostly in black and wearing a black baseball hat was consistent with the description given by the officers of the chased suspect. Further, the details of the *Page 21 
incident were corroborated by the testimony of Wente and Satterfield. Although Hudson complains about the credibility of the witnesses against him, the record demonstrates that defense counsel aptly cross-examined the witnesses, and any credibility issues were for the trier of fact to resolve. Further, insofar as the defense provided alibi witnesses, the jury was free to give credence, or not, to whatever portions of the testimony, if any, it found credible. The inconsistencies do not render Hudson's conviction against the manifest weight of the evidence.
 {¶ 57} We find that Hudson has failed to demonstrate that the jury clearly lost its way and created a manifest miscarriage of justice. Accordingly, his fifth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 22 
KENNETH A. ROCCO, J., and MARY EILEEN KILBANE, J., CONCUR
[1] Evid.R. 613(A) provides: "In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." *Page 1