[Cite as *State v. Railey*, 2024-Ohio-5502.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                           |   |                              |
|---------------------------|---|------------------------------|
| STATE OF OHIO,            | : | APPEAL NO.  C-230559         |
|                           |   | TRIAL NO.   B-1904865        |
| Plaintiff-Appellee,       | : |                              |
|                           |   |                              |
| vs.                       | : |                              |
|                           |   |                              |
| DEMETRIUS RAILEY,         | : |         *O P I N I O N*      |
|                           |   |                              |
| Defendant-Appellant.      | : |                              |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 22, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Kessler Defense LLC* and *Stephanie Kessler*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant Demetrius Railey appeals his conviction, following a jury trial, of rape of a child under 13. Railey challenges the admissibility of certain statements at trial and statements made by the State during closing arguments. After a careful review of the record, we affirm Railey's conviction.

## I. *Factual and Procedural History*

{¶2} On September 5, 2019, Railey was charged in a three-count indictment with rape of a child under 13 by force in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree; abduction in violation of R.C. 2905.02(B)(1), a felony of the third degree; and tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.

{¶3} Railey invoked his right to a jury trial on the charges. But prior to trial, he filed a number of motions seeking to exclude specific pieces of evidence from the jury's consideration.

{¶4} First, on July 5, 2021, Railey filed a motion in limine to exclude from the trial recorded statements he made while in custody, as well as a motion to suppress statements he argued were obtained in violation of *Miranda*. Then, on September 10, 2023, Railey filed an additional motion in limine to prevent the State from presenting body-worn camera ("BWC") footage at trial. The BWC video contained statements made by the child's mother, who had since passed away, as well as statements by the child about the sexual assault. Railey argued that the child's mother's recorded statements violated his Confrontation Clause and due process rights. Railey additionally moved to exclude medical records that included unrelated allegations of sexual abuse perpetrated against an additional person.

{¶5} On September 11, 2023, the trial court conducted an evidentiary hearing

on Railey's motions. Regarding Railey's motion to suppress his recorded custodial statements, the trial court denied the motion, finding that Railey voluntarily provided information to police and therefore did not need to be Mirandized. But the State and defense counsel reached an agreement as to what would be excluded from Railey's recorded statements, obviating the need for a ruling on Railey's initial motion in limine. The State also agreed to redact the medical records to remove references to an additional alleged victim. Regarding Railey's motion in limine to exclude the BWC video containing the child's mother's statements, the trial court denied the motion. It held that the statements were admissible as excited utterances despite the mother's unavailability. It also held that statements made by the child on the BWC video were admissible because she was available for cross-examination.

{¶6} On September 13, 2023, the matter proceeded to trial. The State called nine witnesses at trial (1) the child, (2) the child's aunt ("the aunt"), (3) Officer Brian Kneller, (4) Jamie Brauley, (5) Megan Miller, (6) Officer Charlene Morton, (7) Detective Dana Jones, (8) Devonte Herdeman, and (9) Hallie Dreyer.

{¶7} During her testimony, the child was asked to recall the events of May 4, 2019. She testified that, at the time, she lived in the Hawaiian Terrace apartment complex with her mother, Railey, and four siblings. She testified that, at the time of the incident, she was 12 years old, but was now 17. She explained that Railey was her mother's boyfriend.

{¶8} The child testified that, on the day of the incident, she woke up at about eight o'clock in the morning. When she woke up, Railey left to walk her mother to work. The child explained that when Railey returned, he began to have a conversation with her. During that conversation, Railey asked her "if he could do something with [her] before he married my mom." The child testified that she was confused and that

the conversation eventually stopped when she went to help her siblings and Railey went downstairs to where her mother's bedroom was.

**{¶9}** The child testified that, after Railey went downstairs, he called her to come down. When she went downstairs, Railey continued the previous conversation, saying that "he wanted to lick on somebody[.]" She explained that she did not understand what he was talking about or why he wanted to do that to. She testified that Railey tried to convince her to have sex by stating that he had started having sex at nine years old.

**{¶10}** The child testified that Railey then pushed her on to the bed, grabbed both of her arms, took one of her legs out of her tights, pulled down her panties, and placed his mouth on her vagina. She testified that Railey told her that if she did not comply, she would not get her phone back and would remain on punishment. The child explained that she felt she needed to comply. She explained that Railey stopped when he heard her siblings coming down the steps.

**{¶11}** The child recounted that after Railey stopped, he told her to pull her pants up and to take a bubble bath, which she did. She testified that, after she took a bath and stayed at the house for a little while, she eventually ran away to her aunt's house who lived a parking lot over. The child then told her aunt what happened. According to the child, her aunt called the police then retrieved her other siblings. The child recalled that her aunt's boyfriend picked up her mother from work and brought her home. The child then told her mother what happened. She testified that her mother then confronted Railey. According to the child, Railey denied harming her and then left. The child testified that the fire department took her to the hospital, where she received a medical exam, and vaginal swabs were taken.

**{¶12}** The aunt testified that she was not the biological aunt of the child but

had been the child's mother's best friend since seventh grade. She explained that she knew Railey as "Meechy." The aunt felt the relationship between the child's mother and Railey was moving too fast. The aunt testified that, on the day of the incident, the child's mother was pregnant with Railey's child, to whom she eventually gave birth, but that the child's mother had since passed away. On the day of the incident, the aunt recalled being woken up by someone banging on her door. When she got to the door, she saw that it was her niece. The aunt testified that the child was hysterical and told her that Railey had inappropriately touched her.

{¶13} After speaking with her niece, the aunt called 911. The aunt's 911 call was played by the State and admitted into evidence as State's exhibit 1. The aunt testified that, after she got off the phone with 911, she went to the child's mother's house to retrieve the other children. When she arrived, Railey was there. She testified that when she attempted to get the children to leave with her, Railey said no and grabbed her, and she hit him. The aunt explained that she took the children and went back to her house.

{¶14} At the conclusion of the aunt's testimony, the trial court took a brief recess. During that recess, the parties stipulated to the medical records that would be admitted into evidence. Defense counsel also renewed his objection regarding the playing of the BWC video. The trial court once again overruled the objection.

{¶15} Kneller testified that in May 2019 he was employed with the Cincinnati Police Department. He arrived at the scene and was wearing a BWC. The State moved to play and admit Kneller's BWC video as State's exhibit 2.

{¶16} At the 4:38 mark of the BWC video, a woman who appeared to be the child's mother opened the door and seemed out of breath. She asked the officer to come through the home, to the downstairs, and to the back. As Kneller moved through

the house, the child's mother was crying and moaning. At the 5:11 mark, Kneller arrived at the back door of the apartment where the fire department was gathered outside with the child. Kneller then walked away from the apartment because he had been told that Railey fled from the home. At the 6:59 mark, Kneller returned to the apartment. At the 7:38 mark, the child's mother received a phone call. At the 7:45 mark, while on the phone, the victim's mother stated, "[H]e licked on my baby." A few second later, she stated, "I know she not lying." Kneller then asked her to step outside the apartment to complete her phone call.

{¶17} Later in the BWC video, the child described the events that had occurred earlier in the day. She indicated that Railey had licked her vagina and then made her shower afterwards. She was tearful and visibly upset.

{¶18} Brauley, a social worker at Cincinnati Children's Hospital, testified that she worked in the emergency department and spoke with the child's mother for a few minutes on the day of the incident. She explained to the child's mother that personal crimes officers had responded to the emergency room so she was unable to conduct a full interview as she normally would have. She testified that she observed the interview conducted by officers and she used that information to help inform the staff conducting the medical exam.

{¶19} Miller testified that she is a pediatric sexual assault nurse examiner ("SANE") with 18 years of experience and that she is employed by Cincinnati Children's Hospital. Miller testified that she conducted a SANE exam on the child in May 2019. As part of the exam, she swabbed the child's cheek for a DNA reference and collected swabs from inside and outside of the child's vagina.

{¶20} Morton, a member of the Cincinnati Police Department, explained that in May 2019 she worked as part of the Criminal Investigation Section Major Offenders

6

Unit in personal crimes. She testified that the scene was being secured by uniformed officers when she arrived. She testified that she herself collected a fitted sheet, a pair of black and white leggings, pink underwear, and a green toothbrush belonging to Railey.

{¶21} Jones testified that she was a detective in the Cincinnati Police Department Personal Crimes Unit and the lead detective on the case. Jones testified that she arrived at the hospital to interview the child. She explained that initially she talked to the child's mother separately because she was so upset. Jones then interviewed the child about the incident. She testified that she also interviewed Railey, a recording of which interview was played in court and marked as State's exhibit 5. Jones further explained her role in processing the rape kit, which was sent to the Bureau of Criminal Investigations ("BCI") to be processed for evidence. According to Jones, the vaginal swab came back positive for acid phosphatase, which is a bodily fluid. Jones provided a buccal swab collected from Railey to compare. On cross-examination, Jones testified that acid phosphatase would return positive for vaginal secretions, semen, bodily fluid, or some bacteria. She also testified that she knew there had been a request for Y-STR testing, which is a male chromosome test.

{¶22} Herdeman, a forensic scientist in the DNA unit at BCI, was deemed an expert in the field of DNA analysis without objection. He testified that vaginal, anal/perianal, and oral samples collected from the child were positive for acid phosphatase, which is an enzyme found in bodily fluids. He further testified that the child's underwear was negative for acid phosphatase and that the vaginal and anal/perianal samples had no DNA profile foreign to the child. He explained his recommendation that the case be sent for additional Y-STR testing. According to Herdeman, there was a high quantity of male DNA in the sample, and Y-STR testing

7

only tests for the male DNA present in a sample. Herdeman also testified that it is not expected to see acid phosphatase in touch DNA.

**{¶23}** On cross-examination, Herdeman admitted that DNA can be transferred onto worn clothing, which is called wearer type. He also testified that if unrelated individuals touched a bed sheet where someone else was sleeping, there could be an indirect transfer of DNA. According to Herdeman, this would be more likely in the case of a bodily fluid. Herdeman also testified that the presence of acid phosphatase in a sample did not mean that the sample originated from saliva rather than vaginal fluid.

**{¶24}** Lastly, Dreyer, currently a laboratory supervisor in the BCI DNA unit, testified that she was a forensic scientist in the DNA unit at the time of the incident. She was permitted to testify as a DNA expert. Dreyer explained that Y-STR testing is a male-specific DNA test. She testified that touch DNA would not react with acid phosphatase activity. She further explained that acid phosphatase is found in its highest concentration in semen but can also be found in other bodily fluids such as saliva and vaginal secretions. She further testified that a male DNA profile was obtained from the vaginal samples and that "the Y-STR DNA profile is consistent with Demetrius Railey * * * the Y-Chromosome Haplotype Database of 29,275 profiles and is not expected to occur more frequently than one in every 1,506 male individuals in the U.S. population." She further explained that "a statistic is calculated to estimate what is the rarity in the general population to give weight to, what are the odds that a random individual would be included as well in this same profile." Regarding the anal/perianal samples, Dreyer testified that male DNA was detected; however, it was not of sufficient quality for comparison, meaning that she could not confidently include or exclude any particular person.

8

**{¶25}** On cross-examination, Dreyer testified that the DNA found was not consistent with what she typically sees with a touch sample. She testified that she could not definitively say what the source of the DNA was or how the DNA was placed in the child's vaginal area.

**{¶26}** Following the testimony of Dreyer, the State rested its case. Defense counsel made a Crim.R. 29 motion for an acquittal, which was denied. Defense rested without calling any witnesses and renewed its Crim.R. 29 motion.

**{¶27}** The parties then presented closing arguments. In its closing, the State argued that Railey's DNA was found in the folds of the child's labia and that he was therefore guilty of the charges. The defense argued in its closing that the DNA was found on the child due to secondary DNA transfer. In other words, the defense did not dispute that Railey's DNA was present on the child. Rather, the defense disputed the State's theory as to how Railey's DNA arrived there.

**{¶28}** Following closing arguments, the jury deliberated for a little over four hours and returned guilty verdicts for the rape and abduction charges and a not guilty verdict regarding the tampering with evidence charge.

**{¶29}** On October 16, 2023, the trial court held a sentencing hearing. On the rape charge, it sentenced Railey to 25 years to life. It then merged the abduction charge with the rape charge. Railey was also classified as a Tier III sex offender.

**{¶30}** Railey timely appealed.

## II. *Analysis*

**{¶31}** On appeal, Railey raises three assignments of error. First, Railey argues that the trial court erred by admitting the recorded statements of the child's mother because they were inadmissible hearsay and violated his Sixth Amendment right to confront the witness against him. Second, Railey argues that the State made improper

statements during closing arguments that prejudicially affected his right to a fair trial. Third, Railey argues that the errors in his first and second assignments of error, collectively, deprived him of a fair trial.

### A. Recorded Statements

**{¶32}** In his first assignment of error, Railey argues that the trial court erred in admitting the recorded statements of the child's mother on the BWC video. Railey presents this assignment in two separate parts. First, Railey argues that the child's mother's statements were not excited utterances and were therefore inadmissible under the Ohio Rules of Evidence. Second, he argues that admitting the statements of the child's mother violated his Sixth Amendment right to confront the witness against him, because she had passed away by the time the trial began.

### Excited Utterance Exception

**{¶33}** "[W]e review challenges to the admissibility of hearsay statements under an abuse of discretion standard." *State v. Smith*, 2019-Ohio-3257, ¶ 15 (1st Dist.). Evid.R. 803(2) sets forth a hearsay exception for statements that are excited utterances, which are statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *See State v. Carter*, 2017-Ohio-7443, ¶ 8 (3d Dist.), citing Evid.R. 803(2). Statements are permitted under the excited utterance exception to the hearsay rule when "1) there is an event startling enough to cause 'nervous excitement' in the declarant, 2) the statement, though not strictly contemporaneous, was made before the declarant had time for the nervous excitement to subside, 3) the statement related to the startling event, and 4) the declarant personally observed the startling event." *Id.* at ¶ 17.

**{¶34}** Railey takes issue with several statements made by the child's mother on the BWC video, including: (1) "Meech, he just sexually assaulted my daughter"; (2)

"He licked on my baby"; (3) "My baby had to run from the house"; and (4) "I know she's not lying." Railey specifically challenges whether these statements meet the personal observation requirement of the excited utterance test. He argues that the child's mother did not personally observe the sexual conduct inflicted by Railey on the child and that her statements about that event therefore fall outside of the excited utterance hearsay exception. In doing so, Railey explicitly defines the startling event as the rape rather than as the child's disclosure of the rape.

**{¶35}** In support of his position, Railey relies on *State v. Smith*, 2002-Ohio-6659. In *Smith*, Smith and Frye were dating. *Id.* at ¶ 1. Smith lived with Frye and her two-year-old and six-month-old daughters. *Id.* One evening, Frye woke to Smith standing next to her bed and her six-month-old daughter dead. *Id.* at ¶ 4. Frye left the house, went to a neighbor's home, and told them that Smith killed her baby. *Id.* at ¶ 5. At trial, the State introduced one of the neighbor's testimony as to what Frye said. *Id.* In considering the application of the excited utterance exception to Frye's statements to the neighbor, the Ohio Supreme Court held that what Frye told the neighbor was inadmissible because Frye did not personally observe Smith kill her daughter. *Id.* at ¶ 43-44. It therefore determined that the startling event was the alleged criminal conduct, rather than Frye's realization of the criminal conduct. *Id.* at ¶ 44. But it held the trial court's error in admitting Frye's statement was harmless, with no analysis as to why that was the case. *Id.*

**{¶36}** For its part, the State calls to our attention the Ohio Supreme Court's decision in *State v. Jones*, 2012-Ohio-5677, in which it reached the opposite conclusion from *Smith*. In *Jones*, the defendant confessed to his wife that he had committed a murder. *Id.* at ¶ 10. Less than an hour later, the wife disclosed the information to a friend. *Id.* at ¶ 10-11. The friend's testimony at trial as to the wife's

disclosure was challenged as inadmissible hearsay. *Id.* at ¶ 130-131. On appeal, the Ohio Supreme Court held that the husband's confession to the wife was the startling event, rather than the husband's commission of the crime. *Id.* at ¶ 167. The court thus held that the statements made by the wife qualified as excited utterances and that she did not have to personally witness the murder for her statements about the husband's confession to be admissible as excited utterances. *Id.*

**{¶37}** *Jones* and *Smith* are admittedly difficult to square. *Smith* suggests that the startling event is the crime itself, whereas *Jones* suggests that the realization of the crime is what triggers the excited reaction. The two cases reach opposite answers as to the question of whether an individual must personally observe the event for statements to qualify as excited utterances.

**{¶38}** We need not resolve this tension in the law here. Even if the admission of the child's mother's statements on the BWC video constituted error because she did not personally observe Railey's conduct, that error was harmless. "An error is harmless if after [the improperly admitted] evidence is removed, the outcome of the trial would be the same because the remaining evidence is overwhelming." *State v. Rasheed*, 2023-Ohio-906, ¶ 20 (1st Dist.).

**{¶39}** We have no trouble concluding that the jury would have convicted Railey without the child's mother's statements. The child herself testified at trial as to Railey's conduct, and her statements on the BWC video were largely consistent with her testimony at trial. She made a contemporaneous disclosure and appeared visibly upset and shaken on the BWC video. DNA consistent with Railey's profile was found on a vaginal swab taken from the child, and Railey did not dispute that this DNA was his. While Railey presented an argument that the DNA could have arrived on the child's vaginal area through secondary transfer, testimony from the State's scientific

witnesses undercut the viability of this theory. The remaining evidence against Railey therefore readily supported the jury's verdict. Any error the trial court may have made in admitting the child's mother's statements on the BWC was therefore harmless.

### *Confrontation Clause*

**{¶40}** In his first assignment of error, Railey also asserts that the admission of the child's mother's statements on the BWC video violated his Sixth Amendment right to confrontation, because the child's mother had passed away by the time the trial began.

**{¶41}** "We review objections to evidence based on the Confrontation Clause de novo." (Citations omitted.) *Smith*, 2019-Ohio-3257, at ¶ 10 (1st Dist.).

**{¶42}** As we explained in *State v. Yeban*, 2024-Ohio-2545, ¶ 47 (1st Dist.), "the Confrontation Clause prohibits testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." A threshold inquiry is therefore whether a challenged statement is testimonial or nontestimonial, given that the Confrontation Clause only bars the admission of testimonial statements absent the opportunity to confront the declarant. *State v. Akins*, 2024-Ohio-1491, ¶ 24 (1st Dist.).

**{¶43}** While the Supreme Court has declined to set forth a precise test that distinguishes testimonial from nontestimonial statements, several guideposts separate the two. Statements made in the course of legal proceedings, like those made under oath at a preliminary hearing or before a grand jury, are testimonial, as are certain statements made in response to police interrogation when there is no ongoing emergency and the primary purpose of the interrogation is to collect evidence for trial. *Id.* at ¶ 24, 26. The key is that a testimonial statement is made "under circumstances which would lead an objective witness reasonably to believe that the statement would

be available for use at a later trial." *State v. Hudson*, 2008-Ohio-1265, ¶ 40 (8th Dist.).

**{¶44}** Viewing the statements of the child's mother and the circumstances under which they were made, it is clear that they were nontestimonial. The child's mother's statements were not directed at law enforcement officers or made in response to police interrogation. Rather, Kneller directed her to finish the conversation outside, thus dispelling the notion that police were attempting to record her phone call for later use at a trial. Moreover, no evidence suggests that the child's mother was aware her statements were being recorded, undercutting any suggestion that she herself may have been attempting to document evidence for future use. The statements instead appear to be completely spontaneous and unprovoked by law enforcement.

**{¶45}** Under these circumstances, we cannot say that Railey's right to confrontation was violated.

**{¶46}** Accordingly, we overrule Railey's first assignment of error.

### B. Closing Arguments

**{¶47}** In his second assignment of error, Railey argues that he was denied a fair trial due to prosecutorial misconduct because the State repeatedly referred to the DNA recovered from the child's biological samples as Railey's DNA. In support of his argument, Railey emphasizes that the DNA test results revealed only that the DNA sample was consistent with Railey's DNA, not that it was in fact Railey's DNA.

**{¶48}** Railey takes issue with eight specific statements made by the State in its closing argument (1) "We also know that because he left his DNA on [the child's] body," (2) "The only reason Demetrius Railey's DNA was in the folds of [the child's] labia is because he put it there," (3) "It is his DNA they found," (4) "It's her and him. That's it. Not mom, not brothers, not sister. Her, her body, and Demetrius Railey," (5) "The only reason Demetrius Railey's DNA showed up on [the child's] body is because

14

he put it there. He put his mouth on her genitalia," (6) "So in this case we have the kit. We have Demetrius Railey's DNA on it and we have the victim's DNA on it. And that's it. Okay?," (7) "The only other profile is Demetrius Railey, our defendant. Okay?," and (8) "They're able to develop a profile for Demetrius Railey."

**{¶49}** Railey failed to object to the statements at trial. We therefore review them solely for plain error. *State v. Carter*, 2017-Ohio-1328, ¶ 12 (1st Dist.) ("A defendant's failure to object to an allegedly improper statement by the prosecutor forfeits all but plain error."). To establish plain error, a defendant must demonstrate that the outcome of the proceedings would have been different but for the alleged misconduct. *Id.*

**{¶50}** Prosecutorial misconduct only creates error where it prejudices the defendant by depriving him of a fair trial. *State v. Smith*, 130 Ohio App.3d 360, 366 (1st Dist. 1998). To determine prejudice in the context of prosecutorial misconduct, the effect of the prosecutor's actions must be taken in light of the entire trial. *Hudson*, 2008-Ohio-1265, at ¶ 22 (8th Dist.). Prosecutors are granted a certain level of latitude during closing argument, particularly given that arguments are not evidence. *Carter* at ¶ 12. We therefore evaluate a prosecutor's statements considering the closing argument in its entirety, rather than reviewing isolated statements taken on their own. *Id.*

**{¶51}** Railey's primary objection to the prosecutor's closing argument is that it overstated the significance of the DNA evidence by suggesting that that DNA absolutely came from Railey, when the DNA profile was merely "consistent." Railey relies on *State v. Metcalf*, 2012-Ohio-674 (12th Dist.), to support his argument. In *Metcalf*, the defendant was convicted by a jury of raping his 15-year-old daughter. *Id.* at ¶ 1-2. Expert testimony established that, based on a Y-STR DNA test, the

15

defendant's DNA was consistent with DNA recovered from his daughter, but the State argued in closing that the DNA was in fact the defendant's. *Id.* at ¶ 7. The trial court overruled the defendant's numerous objections to this argument. *Id.* at ¶ 23.

**{¶52}** On appeal, the defendant argued that the trial court erred by allowing the State to refer to the DNA sample as his DNA "when no such reasonable scientific certainty existed," and the Twelfth District agreed. *Id.* at ¶ 23, 27. But the court characterized the prosecutor's statements in closing as harmless. *Id.* at ¶ 31. This was because the number of times the prosecutor improperly referred to the DNA as the defendant's was few and because the prosecutor had, at least some of the time, correctly indicated that the sample was "consistent" with the defendant's DNA rather than absolutely his. *Id.* at ¶ 28, 31.

**{¶53}** The arguments made by the prosecutor in Railey's case are similar to those found to constitute harmless error in *Metcalf* in that they misstated the nature of the DNA evidence. The State's scientific witnesses only testified that the DNA sample taken from the child's vaginal area was "consistent" with Railey's profile, not that it was Railey's DNA.

**{¶54}** Nonetheless, we cannot say that the prosecutor's comments rose to the level of plain error, because we do not believe the outcome of the proceeding would have been different had the prosecutor's closing more closely tracked the evidence. We reach this conclusion in part because Railey's defense counsel conceded that his DNA was found on the child. He focused his efforts at trial on explaining secondary methods of transfer, arguing that the DNA could have been placed on the child after she used a towel that Railey had also previously used. Because Railey never disputed that the DNA was his, he could not be prejudiced by the State's characterization of the DNA as his. The jury was also provided an instruction that the statements made

16

during closing arguments were not to be considered as evidence. And, as we have previously explained, the evidence against Railey was strong. Thus, although the prosecutor's closing argument should have been more faithful to the evidence, we cannot say that plain error occurred in the State's closing argument.

{¶55} We therefore overrule Railey's second assignment of error.

### C. Cumulative Error

{¶56} In his third assignment of error, Railey argues that cumulative error denied him a fair trial.

{¶57} "The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors, deemed separately harmless, deprived the defendant of his right to a fair trial. The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error." (Cleaned up.) *State v. Johnson*, 2019-Ohio-3877, ¶ 57 (1st Dist.).

{¶58} We have, at most, identified a single instance of harmless error in Railey's trial—the admission of the child's mother's statements as excited utterances. We decline, however, to specifically label this decision by the trial court as error, noting tension in the case law surrounding how the excited utterance exception is to be applied. *Compare Jones*, 2012-Ohio-5677, at ¶ 130-131; *Smith*, 2002-Ohio-6659, at ¶ 43-44. But even if this were error, a single instance of harmless error is insufficient to create cumulative error. *Johnson* at ¶ 57.

{¶59} We overrule Railey's third assignment of error.

### III. Conclusion

{¶60} The admission of the child's mother's statements on the BWC video after her death did not violate Railey's rights under the Confrontation Clause, nor did it rise to anything other than potential harmless error under Evid.R. 803(2).

Statements made by the prosecutor in closing argument also did not amount to plain error that deprived Railey of his right to a fair trial. We accordingly affirm Railey's conviction for rape of a child under 13.

Judgment affirmed.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.