[Cite as *State v. Godfrey*, 2025-Ohio-1575.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-240140 |
| | | C-240154 |
| Plaintiff-Appellee, | : | TRIAL NO. B-2101673-A |
| (J.S., Victim-Appellant), | : | |
| vs. | : | *JUDGMENT ENTRY* |
| CARL GODFREY, JR., | : | |
| Defendant-Appellant, | : | |

This cause was heard upon the appeals, the record, and the briefs.

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed 100% to defendant-appellant Godfrey.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 5/2/2025 per order of the court.**

**By:**_____
  **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-240140 |
| | | C-240154 |
| Plaintiff-Appellee, | : | TRIAL NO. B-2101673-A |
| (J.S., Victim-Appellant), | : | |
| vs. | : | *O P I N I O N* |
| CARL GODFREY, JR., | : | |
| Defendant-Appellant, | : | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: May 2, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Morgan Galle* and *Elizabeth A. Well*, Ohio Crime Victim Justice Center, for Victim-Appellant,

*Timothy J. McKenna*, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} Defendant-appellant Carl Godfrey, Jr., appeals his convictions on multiple felony counts arising from two shootings that occurred days apart in Cincinnati.

{¶2} Godfrey argues that his convictions for aggravated murder, murder, felonious assault, and having weapons while under disability were not supported by sufficient evidence and were contrary to law. He further maintains the trial court erred in failing to sever counts for the two shooting incidents. Godfrey also challenges evidence admitted without the opportunity for cross-examination. In another evidentiary attack, he assigns as error the admission of a video in which he possesses firearms. Godfrey also contends that the prosecution engaged in misconduct by making unsupported assertions during opening and closing statements, and that his trial counsel provided ineffective assistance of counsel. Finally, Godfrey attacks his sentences, arguing that they violated the constitutional prohibition against cruel and unusual punishment.

{¶3} In a related appeal, victim-appellant J.S. challenges the trial court's denial of restitution on the basis of an alleged legal error. The trial court concluded that it could not entertain J.S.'s request for restitution because it was sentencing Godfrey to prison.

{¶4} After reviewing the extensive record in this case, we reject Godfrey's challenges and affirm the trial court's judgments as to Godfrey's convictions and prison sentences. But we agree with J.S. that Godfrey's imprisonment was not a bar to the trial court's ability to award restitution. We accordingly sustain J.S.'s assignment of error and remand the matter to the trial court to conduct a restitution hearing.

### *Factual and Procedural History*[1]

### *A. The Westwood Northern Shooting*

**{¶5}** Around 4:00 p.m. on February 16, 2021, law enforcement officers were summoned to an apartment complex at Westwood Northern Boulevard and Montana Avenue following a reported shooting. The responding officers observed a silver Saturn Vue in the parking lot with shattered windows and bullet holes in the body of the vehicle.

**{¶6}** The man in the driver's seat of the Vue, later identified as D.O., sustained six gunshot wounds and was unresponsive. A second man, A.W., was lying on the ground just outside the front passenger seat. A.W. was conscious and able to tell the officers he had been shot. A third individual, a woman identified as M.F., fled on foot to a nearby apartment where a stranger offered her sanctuary. M.F. also sustained gunshot wounds. Both A.W. and M.F. ultimately survived the incident, but D.O. succumbed to his injuries at the scene.

**{¶7}** M.F. testified at trial. She stated that she was with D.O., her longtime boyfriend, when she was contacted by an acquaintance from Millvale known as "Shiest." Another witness testified that "Shiest" was A.W.'s nickname. A.W. solicited a ride from M.F. on the day in question. She and D.O. picked him up in M.F.'s Vue. According to M.F., A.W. was communicating on his phone for the duration of the ride with someone he referred to as "C.J." Another witness later explained that "C.J." was Godfrey.

**{¶8}** The trio eventually arrived at an apartment complex on Westwood

---

[1] At trial, the State called a large number of witnesses and introduced voluminous exhibits. Godfrey elected to present no evidence of his own. Thus, all facts surrounding the two shootings are derived from the testimony and exhibits presented by the State.

Northern Boulevard, where Godfrey instructed A.W. to wait for someone to come out of one of the units. They waited for about ten minutes. According to M.F., three men wearing ski masks walked past the car and continued out of sight. She testified that the Vue started to drive off and, at that moment, gunshots rang out. That was when the vehicle and its three occupants were shot.

{¶9}     Detectives from the Cincinnati Police Department investigated the shooting. Their findings led them to theorize that Godfrey had orchestrated a hit on A.W., whom he owned money. They believed Godfrey solicited Mikeem Thomas and codefendants Jason Gray and Mario Gordon to carry out the shooting and that codefendant Conn Inabnitt drove the getaway car.

### B.  The Millvale Shooting

{¶10}   According to the evidence presented by the State, on February 18, 2021, two days after the Westwood Northern shooting, police responded to a ShotSpotter alert issued at 8:16 p.m. in the vicinity of an apartment complex on Millvale Circle. There they discovered a man, later identified as D.S., lying face down in the street. D.S. had sustained a single gunshot wound to the head. Officers rolled the man over and began resuscitation efforts, but quickly realized he was deceased.

{¶11}   Detectives from the Cincinnati Police Department investigated. Their findings led them to hypothesize that Godfrey and Thomas approached the apartment complex on foot via a cut-through area in the woods and opened fire on D.S. They further theorized that Godfrey acted in retaliation for a perceived hit taken out on him the day before. That hit was ostensibly ordered by a man known by the nickname "Lil E," the brother of Westwood Northern shooting victim A.W.

{¶12}   On February 21, 2021, three days after the Millvale shooting, Godfrey was taken into custody while leaving an apartment complex on Shadymist Lane. A

black Apple iPhone XR seized during the arrest yielded a large volume of evidence that the State synthesized to link Godfrey to both shootings.

### C. Procedure

{¶13} On April 7, 2021, a grand jury returned a 28-count indictment against Godfrey, Gray, Gordon, and Inabnitt.[2] Counts 1 through 10 contemplated charges for an unrelated murder of a man known as J.C. The remaining counts pertained to the Westwood Northern and Millvale shootings. Among the charges against Godfrey were two counts of aggravated murder, four counts of murder, eight counts of felonious assault, and two counts of having weapons while under disability. All counts except the weapons under disability charges were accompanied by firearm specifications.

{¶14} Prior to trial, Godfrey moved to sever the charges in the indictment based on the dates of their alleged commission. He argued that the J.C.-related counts, the Westwood Northern counts, and the Millvale counts should be tried separately. The trial court agreed to sever the J.C.-related counts but otherwise denied the motion. Godfrey also filed a motion in limine seeking to exclude photographs and videos depicting him with firearms. That motion was denied.

{¶15} The case was tried to a jury over a ten-day period. Following deliberations, the jury returned guilty verdicts on all counts against Godfrey, including the specifications. After merging several counts and specifications, the trial court imposed an aggregate sentence of two terms of life imprisonment without the possibility of parole plus 25 to 29 years in the Ohio Department of Rehabilitation and Correction.

{¶16} At the sentencing hearing, the State asked the trial court to order

---

[2] Because Thomas was a 14-year-old minor at the time of the shootings, the case against him proceeded separately in the Hamilton County Juvenile Court.

restitution to J.S. to offset a deceased victim's funeral expenses. Without taking evidence as to J.S.'s expenses, the trial court denied restitution. The trial court indicated that it could not order restitution because it was sentencing Godfrey to prison.

{¶17} Both Godfrey and victim J.S. timely appealed from the trial court's judgment entry. We consolidated the two appeals.

### *Analysis of the Godfrey Appeal*

{¶18} Godfrey raises nine assignments of error. We address each in turn.

### *A. Prosecutorial Misconduct*

{¶19} In his first assignment of error, Godfrey contends that he was denied a fair trial due to prosecutorial misconduct during opening and closing statements. He points to statements by prosecutors describing him to the jury as a "hired assassin," a "contract killer," and "John Wick . . . the hit man of the criminal underworld." He argues that these accusations were unsupported by the record, were inserted merely to inflame the jury's passions, and were unfairly prejudicial. He also challenges the prosecutor's statement in closing that the State was not required to prove the identity of the person paying Godfrey.

{¶20} Godfrey failed to object to these statements at trial, meaning our scrutiny is confined to plain error review. *State v. Carter*, 2017-Ohio-1328, ¶ 12 (1st Dist.); *see* Crim.R. 52(B). Prosecutorial misconduct only creates reversible error when it deprives the defendant of a fair trial. *State v. Lang*, 2011-Ohio-4215, ¶ 155. The central inquiry is whether the prosecutor's remarks were improper and prejudicial to the substantial rights of the accused. *State v. Shelton*, 2023-Ohio-2458, ¶ 12 (1st Dist.). The remarks must be evaluated in the context of the entire trial rather than individually. *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). The focal point is the

fairness of the trial and not the culpability of the prosecutor. *Lang* at ¶ 155. Moreover, "[i]t must be clear beyond reasonable doubt that, absent the prosecutor's comments, the jury would have [still] found the defendant guilty." *State v. Grimes*, 2005-Ohio-203, ¶ 18 (1st Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), and *Treesh*.

{¶21} It is well-settled that opening statements and closing arguments are not evidence. *State v. Frazier*, 73 Ohio St.3d 323, 338 (1995). Here, the trial court instructed the jury as much. Opening statements offer a preview of the party's claims and give the jury a roadmap for evidence sought to be presented at the trial. *See Parrish v. Jones*, 2013-Ohio-5224, ¶ 29. "During opening statements, counsel is accorded latitude and allowed 'fair comment' on the facts to be presented at trial." *State v. Diar*, 2008-Ohio-6266, ¶ 145, quoting *State v. Leonard*, 2004-Ohio-6235, ¶ 157.

{¶22} Godfrey criticizes the State for portraying him as a paid assassin and a hitman. That, it did. But its reasons and means were distinct from cases in which the prosecution resorts to name-calling solely to mislead or inflame the jury. *Compare Smith* at 14 (holding that prosecutors "must avoid insinuations and assertions which are calculated to mislead the jury"). For example, in *State v. Hall*, 2019-Ohio-2985 (1st Dist.), we found misconduct where the assistant prosecutor repeatedly referred to the defendant as a "wolf" and a "predator" during closing arguments in a child sexual abuse case. *Id.* at ¶ 27-34. We found that the remarks were inserted solely to inflame the jury and deliberately saturate the trial with emotion. *Id.* at ¶ 33. Not so here.

{¶23} In contrast to *Hall*, the record does not support that the prosecutor's comments were presented for improper purposes. *See id.*; *compare State v. Liberatore*, 69 Ohio St.2d 583, 589-590, fn. 9 (1982) (finding misconduct where the prosecutor characterized the defendant as a "thug" and a "hardnosed goon" solely to

inflame the jury). Rather, statements by the prosecutor highlighting Godfrey's profit motive were consistent with the evidence that Godfrey was paid to kill people. As we address more fully with regard to Godfrey's sufficiency and weight assignments of error, a range of direct and circumstantial evidence supported the notion that Godfrey orchestrated the Westwood Northern shooting in exchange for money. Because the prosecutor was commenting on this evidence, no plain error occurred when the prosecutor advanced the "contract killer" theory in opening and closing.

{¶24} Godfrey similarly takes issue with the State's argument that the identity of the person who paid Godfrey was immaterial. "The purpose of closing argument is to summarize the evidence at trial. Attorneys argue what conclusions the finder of fact should draw from that evidence." *John F. Bushelman Constr. v. Glacid Group*, 1996 Ohio App. LEXIS 2624, *9 (1st Dist. June 26, 1996). Generally speaking, prosecutors are afforded a wide degree of latitude during closing arguments. *See State v. Richey*, 64 Ohio St.3d 353, 362 (1992). They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *Id.* Here, text messages introduced at trial indicated that the perpetrators of the Westwood Northern shooting, including Godfrey, expected to be paid for their activities. The State's inability to prove the identity of the payor did not negate the significance of Godfrey's profit motive or his participation in the crimes. Accordingly, the prosecutor did not engage in misconduct by addressing the State's inability to prove who was paying Godfrey during closing arguments.

{¶25} In sum, because the prosecutors' remarks did not rise to the level of plain error, Godfrey's first assignment of error is overruled.

### B. Confrontation Clause and Hearsay

{¶26} In his second assignment of error, Godfrey argues that the admission of

text messages and chats from various cell phone applications violated his constitutional right to confrontation. Godfrey further maintains that the texts and chats constituted inadmissible hearsay. He contends that he was prejudiced by the admission of these communications in light of what he characterizes as scant physical evidence linking him to the two shootings.

**{¶27}** The participants to the texts and chats did not testify at trial. Rather, detectives recited the contents of the communications and speculated as to the identities of the participants—Godfrey chief among them. Thus, we examine whether the absence of the witnesses who sent the text messages deprived Godfrey of his constitutional rights under the Confrontation Clause.

### 1. *Confrontation Clause*

**{¶28}** We conduct a de novo review of claims of error under the Confrontation Clause. *State v. Railey*, 2024-Ohio-5502, ¶ 41 (1st Dist.).

**{¶29}** The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." A threshold inquiry in assessing a Confrontation Clause claim is whether the out-of-court statement was "testimonial." *Crawford v. Washington*, 541 U.S. 36, 59, 68 (2004). If so, the admission of the statement at trial violates the accused's right to confrontation unless he is afforded the opportunity to cross-examine the declarant. *Id.* at 53-56.

**{¶30}** The hallmark of a Confrontation Clause claim is therefore the inability to cross-examine a testimonial statement. A testimonial statement is one made under circumstances such that "an objective witness [would] reasonably [ ] believe that the statement would be available for use at a later trial." *State v. Stahl*, 2006-Ohio-5482, ¶ 36. As this court has previously explained, this includes statements "made in the

10

course of legal proceedings, like those made under oath at a preliminary hearing or before a grand jury" and "statements made in response to police interrogation when there is no ongoing emergency and the primary purpose of the interrogation is to collect evidence for trial." *Railey* at ¶ 43.

**{¶31}** Godfrey's Confrontation Clause argument expressly challenges messages involving codefendant Jason Gray. He argues that Gray in essence testified at trial through electronic communications without being subject to cross-examination. Godfrey claims this prejudiced his ability to paint Gray as the mastermind of the Westwood Northern shooting. Godfrey also takes issue with additional text messages sent to him by Tracy Ray, the girlfriend of Godfrey's codefendant Gordon. Ray did not testify at trial.

**{¶32}** Viewing the various text messages and chats and the circumstances under which they were made, it is clear that they were nontestimonial. The statements were not made in the course of legal proceedings. *See Railey*, 2024-Ohio-5502, at ¶ 43 (1st Dist.). Nor were they directed at law enforcement officers or made in response to police interrogation. *See id.* An objective person would not have believed that the texts would be used in a future trial. *See id.*; *see also State v. Hinkston*, 2015-Ohio-3851, ¶ 19 (1st Dist.) ("the people involved in the text conversations about drugs and guns did not intend for the messages to become any part of a criminal trial"). Because the messages were all nontestimonial, Godfrey's confrontation rights were not implicated by their admission. *Id.* at ¶ 18.

### 2. *Hearsay*

**{¶33}** Godfrey also argues that the text messages and chats constituted inadmissible hearsay under the Ohio Rules of Evidence. While the Confrontation Clause and the hearsay rule have been found to safeguard similar values, the two

protections are not coextensive. *State v. Dever*, 64 Ohio St.3d 401, 415 (1992). For its part, the hearsay rule generally bars the admission of out-of-court statements offered to prove the truth of the matter asserted. *State v. Smith*, 2019-Ohio-3257, ¶ 15 (1st Dist.); Evid.R. 801 and 802. Such out-of-court statements are inadmissible unless they fall within a limited number of clearly-delineated exceptions. *State v. Trusty*, 2013-Ohio-3548, ¶ 42 (1st Dist.); Evid.R. 803 and 804.

{¶34} The text messages and chats were admissible under a number of hearsay exceptions. For one, any messages created by Godfrey were admissible as admissions by a party-opponent. *Hinkston* at ¶ 17; Evid.R. 801(D)(2)(a). For another, the statements made by persons other than Godfrey were admissible as statements made by coconspirators in furtherance of a conspiracy. *See State v. Daniels*, 92 Ohio App.3d 473, 482 (1st Dist. 1993); Evid.R. 801(D)(2)(e). At trial, the State proved the existence of a conspiracy amongst Godfrey and his codefendants to lure A.W. to the Westwood Northern location to take his life. As a result, any statements by Godfrey's coconspirators in the texts and chats were admissible as nonhearsay. Finally, communications by Ray and other tangential actors were also admissible as nonhearsay. Rather than being offered for their truth, the record indicates those statements were properly admitted for contextual purposes. *See Hinkston* at ¶ 17, citing Evid.R. 801(C).

{¶35} Because the challenged electronic communications were not testimonial and were not barred as hearsay, Godfrey's second assignment of error is overruled.

### C. Sufficiency and Manifest Weight of the Evidence

{¶36} In his third and fourth assignments of error, Godfrey challenges the sufficiency and weight of the evidence supporting his convictions. Specifically, he

contends that the State failed to prove that he aided and abetted his codefendants in causing the death of D.O. and in committing the felonious assaults of A.W. and M.F. in the Westwood Northern shooting. Nor, Godfrey argues, did the evidence identify him as the perpetrator in the Millvale shooting.

{¶37} Godfrey was convicted, in part, of two counts of aggravated murder in violation of R.C. 2903.01(A), both special felonies. For these offenses, the State was required to prove that he purposely, with prior calculation and design, caused the deaths of D.O. and D.S. Godfrey was also convicted of two counts of felonious assault in violation of R.C. 2903.11(A)(1), felonies of the second degree. Relative to those offenses, the State was tasked with proving that he knowingly caused serious physical harm to A.W. and M.F. For the attendant firearm specifications, the State was required to prove that Godfrey displayed, brandished, indicated he possessed, or used a firearm to facilitate the offenses of aggravated murder and felonious assault. R.C. 2941.145(A). Finally, Godfrey was convicted of two counts of having weapons while under disability in violation of R.C. 2923.13(A)(2), felonies of the third degree. For these offenses, the State was required to prove that he knowingly acquired, had, carried, or used a firearm while having been adjudicated a delinquent child for an offense that would be a felony offense of violence if committed by an adult. At trial, Godfrey acknowledged that he was legally disabled from possessing a firearm and stipulated that he had not been relieved from the disability.

### 1. *Standards of Review*

{¶38} To assess whether a conviction is supported by sufficient evidence, we ask "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Wright*, 2025-Ohio-672, ¶ 9, quoting State *v.*

*Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶39} Unlike sufficiency review, a manifest weight challenge requires us to independently "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 397 (1997). Reversal and retrial are warranted only in "exceptional cases in which the evidence weighs heavily against the conviction." *State v. Sipple*, 2021-Ohio-1319, ¶ 7 (1st Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### 2. *Convictions Arising from the Westwood Northern Shooting*

{¶40} In conjunction with the Westwood Northern shooting, Godfrey was convicted of one count of aggravated murder, two counts of felonious assault, and one count of having weapons while under disability.[3] The State proceeded on a complicity theory of liability for these charges. Ohio's complicity statute provides in pertinent part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . (1) Solicit or procure another to commit the offense; (2) Aid or abet another in committing the offense; [or] (3) Conspire with another to commit the offense . . . [.]" R.C. 2923.03(A).

{¶41} The State surmised that Godfrey orchestrated the Westwood Northern shooting. According to the State's evidence, Godfrey gathered a team consisting of

---

[3] While Godfrey's appellate brief purports to challenge the remaining counts and specifications in the indictment connected to the Westwood Northern shooting, we need not address those arguments. A conviction exists where there has been a guilty verdict *and* a sentence imposed thereon. *State v. Johnson*, 2021-Ohio-1321, ¶ 12 (1st Dist.), quoting *State v. Croom*, 2013-Ohio-5682, ¶ 59 (7th Dist.). No sentence was imposed on the remaining counts and specifications because they were merged. Thus, we do not consider Godfrey's arguments as to these counts and specifications. *See id.*

Gray, Gordon, and Thomas and ensured they were armed. He arranged a meetup with A.W. under the guise of repaying a monetary debt. Godfrey stayed behind while his recruits left to meet A.W. Gray took charge of scouting a location devoid of cameras for the planned shooting, communicating with Godfrey all the while. Eventually, they settled on the apartment complex at the corner of Westwood Northern Boulevard and Montana Avenue. The State theorized that Godfrey separately communicated with A.W. to draw him to the location and keep him there until the ambush by Gray, Gordon, and Thomas.

{¶42} On appeal, Godfrey emphasizes that he was not present at the scene of the Westwood Northern shooting. It is true that Gray, Thomas, and Gordon fired upon the Vue, killing D.O. and wounding A.W. and M.F. Minimizing his role in these events, Godfrey contends there was insufficient evidence that he acted in concert with his codefendants. He points to a perceived lack of physical evidence and eyewitness testimony implicating him and contends that Gray was in charge during the shooting. Godfrey further maintains it was Tracy Ray, Gordon's girlfriend, who arranged the transportation and Gray who chose the location of the shooting. Finally, Godfrey emphasizes that the State presented no evidence as to who ostensibly hired him to kill A.W.

{¶43} We disagree with Godfrey's view of the evidence. With regard to the Westwood Northern shooting, sufficient evidence supported the State's theory that Godfrey organized, planned, and facilitated an attack on A.W. that resulted in D.O.'s death. We summarize that evidence here.

### a. Direct evidence implicating Godfrey

{¶44} Codefendant Mario Gordon testified that he met Godfrey in February 2021 when he and his then-girlfriend Ray joined a group trip to Miami, Florida.

15

Godfrey was introduced to Gordon as "C.J." Gordon testified that his primary source of income at the time was robbing people. While in Miami, Godfrey told Gordon he had a couple of potential "moves" for them back home.

{¶45} The group returned to Cincinnati. About two days later, per Gordon's testimony, Godfrey reached out through Ray to solicit help on a job. Ray procured a ride for Gordon from Inabnitt, a bootleg cab driver who had transported them to the airport to travel to Miami. Inabnitt picked up Gordon first and codefendant Jason "2-4" Gray after.

{¶46} The men traveled to an apartment building on Sutter Avenue in English Woods. Inside, Gordon and Gray met Godfrey and Thomas. Gordon testified that Godfrey was texting with someone called "Shiest" or "Shiesty," later identified as A.W., to arrange a rendezvous. Gordon presumed they were going to rob A.W. According to Gordon, Godfrey asked if everyone was armed and checked their guns. Godfrey offered to switch Gordon's Springfield Hellcat 9 mm pistol for his own firearm, but Gordon declined. Godfrey then instructed Gray, Gordon, and Thomas to meet A.W. The three men got back into Inabnitt's vehicle and traveled on.

{¶47} Gordon testified that Gray directed the group after they left Sutter Avenue to scout a location for the meeting. But he relayed that Gray was in constant contact with Godfrey via text message for the duration of the ride. The men eventually ended up at the apartment complex off Westwood Northern Boulevard. Inabnitt parked on a side street and stayed put while the trio disembarked from the vehicle. They donned black ski masks and proceeded on foot.

{¶48} Gordon testified that the trio walked past a silver SUV parked in the lot, at which point one of the passengers, A.W., asked if any of them went by the nickname "2-4." Gray and Gordon both replied in the negative and continued walking. Gray

16

covertly informed his cohorts that the man who spoke to them was their target. The SUV began pulling off, at which point Gray opened fire, and Gordon and Thomas followed suit. Gordon testified that the trio then ran back the way they came, got back into Inabnitt's vehicle, and left.

{¶49} Shooting victim M.F. also testified on behalf of the State and corroborated portions of Gordon's story. M.F. maintained that A.W. contacted her around 1:00 to 2:00 p.m. on February 16, 2021. She and her boyfriend D.O. departed in her Vue to give A.W. a ride. M.F. testified that A.W. was communicating on his phone with someone about where to go and directing D.O. accordingly. M.F. testified that A.W. repeatedly referred to the individual as "C.J." She later learned that C.J. was Godfrey. M.F. maintained that A.W. was on the phone with Godfrey the entire ride. According to M.F., Godfrey directed A.W. to meet someone at the apartment complex on Westwood Northern Boulevard. About ten minutes later, the shooting occurred.

### b. *The investigation into the Westwood Northern shooting*

{¶50} Detective Best, who served as lead investigator on the case, provided information that further corroborated these narratives. According to Best, an eyewitness provided a cell phone image of the license plate of a Chevy Trailblazer observed fleeing from the scene immediately after the shooting. Best accessed computer records and discovered that the vehicle was registered to Inabnitt. She learned that Inabnitt had recently transported a group to the airport for a trip to Miami. Best then contacted airport police and obtained video and a manifest for Flight 1331 that departed "CVG" at 3:50 p.m. on February 10, 2021. According to Best, both Godfrey's and Gordon's names appeared as passengers on the flight manifest. These details corroborated portions of Gordon's story.

{¶51} In conjunction with the investigation, Best obtained a search warrant

for account information associated with the Facebook username "Bay Rue." She also reviewed data extracted from the Apple iPhone XR seized from Godfrey during his arrest. Best testified that the telephone number coincided with the number she had been told was his. She also obtained a warrant for the iCloud information associated with the phone, the email address johnwickbang@icloud.com, and the primary number associated with the iCloud account. According to Best, Godfrey became a suspect in the Westwood Northern shooting due to the content of the messages in the data extractions.

{¶52} Detective Tracy Jones testified to Godfrey's arrest and the search of the apartment on Shadymist Lane. Jones indicated the unit was rented by Angelique Morris, who was in a relationship with Godfrey. According to Jones, officers seized a set of keys from Godfrey during his arrest, and one of those keys unlocked the door to the unit. The officers procured a warrant and seized a number of items from the apartment. Among them was a prescription medication bottle with Godfrey's name on it, a Saks Fifth Avenue receipt for Versace Jeans listing the "client" or purchaser as "Johnny bang," and ammunition including 9 mm rounds, a .380 round, 7.62 x 39 mm rifle rounds, and .22-caliber rounds.

{¶53} Kelsey Cramer and Bridget Chambers were two firearms examiners employed by the Hamilton County Crime Lab who worked the Westwood Northern case. Cramer testified that she examined spent shell casings collected from the scene and corroborated that they were fired from three different firearms. For her part, Chambers tested two firearms obtained later in the investigation, as well as a shell casing seized from the apartment on Shadymist Lane. Chambers testified that one of the firearms, a Springfield Hellcat 9 mm, fired one of the groups of casings collected from the scene. Chambers further identified the casing taken from Shadymist as

having been fired from a Taurus Model PT111, which was one of the firearms ultimately linked to the Westwood Northern shooting.

{¶54} Sergeant Jerome Herring participated in Godfrey's arrest. He identified and authenticated footage from his body-worn camera which was played in open court. In the footage, officers could be seen surrounding a vehicle in which Godfrey was the front seat passenger. Herring could be heard telling his fellow officers that Godfrey needed to be removed from the vehicle as soon as possible because he was actively texting someone on his cell phone. Herring affirmed that Godfrey's Apple iPhone XR was confiscated from him at that time.

### c. Electronic evidence bolsters the State's "John Wick" narrative

{¶55} The State's ability to solidify Godfrey as the architect of the Westwood Northern shooting was due in part to the testimony elicited at trial and in part to the voluminous electronic evidence extracted from Godfrey's iPhone XR and iCloud account. A thorough review of this evidence supports the State's theory that Godfrey aspired to a career as a contract killer and that he was paid to orchestrate the attempt on A.W.'s life. The movie persona John Wick, an infamous fictional hitman, appears in various places associated with Godfrey, including his email address (johnwickbang@icloud.com), the names he used to identify himself ("Johnny," "Johnny Bang," and "Johnny Bang Man"), and the way he described himself to others ("I'm a killer, 24/7" and "I keep telling these n***as I'm John wick"). This persona dovetailed with the direct and circumstantial evidence elicited by the State that identified Godfrey as the mastermind of both shootings.

{¶56} Officer Roberta Utecht, a forensic examiner, testified that she extracted data from Godfrey's Apple iPhone XR, the iCloud backup tied to Godfrey, and A.W.'s Apple iPhone 12. She confirmed that the Apple ID associated with the iPhone XR was

johnwickbang@icloud.com. Utecht further testified to the phone number attached to the device. That same phone number was also associated with the Apple ID johnwickbang@icloud.com. Utecht testified that the extracted data was broken down into different subsets, one of which was chats. According to Utecht, 983 chats were extracted from the Apple iPhone XR.

{¶57} Utecht identified a Cellebrite report containing all the data extracted from the Apple iPhone XR associated with the Apple ID johnwickbang@icloud.com and the related phone number. The report indicated 19 user accounts associated with the phone. These included accounts on Facebook (Bay Rue), Facebook Messenger (Bay Rue), Snapchat, TextNow, and others. Utecht also performed a data extraction from the Apple iCloud backup and identified the report conveying the data. She testified that the backup was associated with Apple IDs dayanlan35@icloud.com and brooke.vasquez15@icloud.com and a primary phone number distinct from the Apple iPhone XR's.

{¶58} Detective Best testified that nearly all the user accounts associated with that phone were registered to johnwickbang@icloud.com. Of particular import, Best identified a Facebook business record for username Bay Rue. The email address registered to the account was johnwickbang@icloud.com, the vanity name Johnny.bang.75457, and the phone number was the same as that associated with the iCloud account. Best testified that this same phone number was provided to her by an anonymous source as the number for Godfrey's iCloud backup. Best further testified that the Facebook information included a profile picture associated with the Bay Rue account, which she identified in open court as Godfrey. Finally, Best testified to a Facebook business record depicting a January 6, 2021 chat in which Bay Rue told the other party his name was Carl Godfrey. Best also identified a number of Facebook

20

messages in which Godfrey gave out the iPhone XR and iCloud numbers as his.

{¶59} Best also identified a screenshot from Godfrey's Apple iPhone XR capturing the Facebook profile information for Murdaa Businezz Kymo. According to Best, she recognized the individual associated with that account as Jason Gray. Best obtained a search warrant for the Murdaa Businezz Kymo Facebook account. The report indicated an alternate name for the account of "Underrated TwoFoe [2-4]." Through her investigation, Best learned that Gray went by the nickname "2-4." Best identified a photograph of Gray at trial.

{¶60} Officers were summoned to the Westwood Northern shooting scene around 4:00 p.m. on February 16, 2021. At trial, Best discussed a message chain between Godfrey and Gray commencing at 9:14 a.m. that same day. According to Best, this was the beginning of hours-long conversations in which Godfrey worked to facilitate the meetup between Gray and A.W. through cell phone communications. This accorded with Gordon's testimony that Gray and Godfrey were in constant communication in the hours leading up to the shooting. Best also verified that the State's communications log included extensive communications between Godfrey and A.W. on the day in question. This accorded with M.F.'s testimony that A.W. and Godfrey were in constant contact in the time before the shooting.

{¶61} Best further solidified Godfrey's identity as a participant in the scheme. When asked how she knew Godfrey was responsible for sending the incriminating messages from the Apple iPhone XR, Best pointed to a screenshot of a FaceTime video call. According to Best, Godfrey sent A.W. the screenshot in the hours preceding the shooting showing himself and Gray on a FaceTime call. The image was retrieved from the Apple iPhone XR. Best testified that the screenshot coincided with the content of the messages between Godfrey and A.W. in the hours before the shooting (i.e., when

they were trying to plan the meetup for the ostensible purpose of Godfrey paying A.W. money owed to him). Godfrey was trying to appease A.W. by assuring him that Gray was en route and showing A.W. that he was on a FaceTime video call with Gray at that very moment. Best testified that the screenshot was captured at 11:13 a.m. on February 16, 2021, by the Apple iPhone XR.

{¶62} Former FBI Agent Lance Kepple, owner of a company called Precision Cellular Analysis, also testified on behalf of the State. Kepple was admitted as an expert in the field of cell phone record analysis. He analyzed records maintained by the carriers for the numbers associated with Godfrey's phone and Thomas's phone. According to Kepple, the cell phone records revealed activity on the phones in question in the vicinities of Sutter Avenue and Westwood Northern Boulevard on the day of the shooting. Kepple's analysis further corroborated the narratives provided by Gordon and M.F. and bolstered the suspected identities of parties to the cell phone messages.

{¶63} Further evidence in the electronic records supports identity. At trial, Best testified to a number of identifying documents extracted from the iCloud backup. One such image was a temporary ID card issued in the name of Carl Andrew Godfrey, Jr. Best confirmed that the photograph on the ID was Godfrey. Another image was a photograph of a Social Security card issued to Carl Andrew Godfrey. Also extracted were photographs of a birth certificate for Carl Andrew Godfrey, Jr., a pandemic unemployment application submitted by Godfrey, and a 2019 W-2 issued to Godfrey.

{¶64} Best also explained the method that participants to the cell phone communications would use to identify one another in the absence of using their real names. For example, Best testified to a chat between Godfrey and "Mini Twin Blood Thirsty," who was later identified as Thomas, on February 15, 2021. According to Best, Godfrey opened the chat by asking who the other person was. The recipient replied,

"Mikeem."

**{¶65}** This was consistent with Gordon's testimony. As Gordon explained, the TextNow app permits the user to hide his or her real phone number from the recipient's view. Gordon noted that one could anonymously communicate and then delete the text chain afterward to cover his tracks. Another way to confirm identities despite masked numbers was to solicit a photograph. For example, at the commencement of one of the message chains, Godfrey told the recipient, "Send me a picture of me and you." In response, he received a photograph depicting himself and Gray. That served to verify that Godfrey was, in fact, speaking to Jason Gray. This method was utilized various times throughout the messages in the State's communications log.

**{¶66}** All of this evidence—the first-hand accounts of Gordon and M.F.; the ballistic evidence found at the scene and the Shadymist apartment; Godfrey's use of the "John Wick" moniker; and the extensive cell phone evidence connecting Godfrey to the crime—persuasively identifies Godfrey as the mastermind of the Westwood Northern shooting.

**{¶67}** The State's inability to name the person who paid Godfrey to commit the Westwood Northern shooting does not undermine this conclusion. Best testified that investigators had suspicions about who offered $20,000 for the hit on A.W., but they were never able to definitively prove the payor's identity. Nonetheless, Best agreed that, shortly after the Westwood Northern shooting, Gray and Thomas exchanged messages with Godfrey discussing the prospect of getting paid. This was sufficient to satisfy the prior calculation and design element of aggravated murder, even though that identity of the payor was unknown.

**{¶68}** After a thorough review of the record, we hold that the direct and

circumstantial evidence elicited by the State sufficiently and credibly established Godfrey's identity as a complicitor in the Westwood Northern shooting. If we construe the evidence in favor of the State, as the law commands, there was more than enough evidence to show identity. Regarding the manifest weight of the evidence, we cannot say the jury went astray in affording weight to the testimony of the State's witnesses which, if believed, provided abundant evidence establishing Godfrey's identity with regard to the Westwood Northern shooting. Accordingly, we reject Godfrey's sufficiency and weight challenges to these convictions.

### 3. *Convictions Arising from the Millvale Shooting*

**{¶69}** In conjunction with the Millvale shooting, Godfrey was convicted of one count of aggravated murder for the death of D.S. and one count of having weapons while under disability.[4] The State proceeded on a direct theory of liability for these charges, meaning it was tasked with proving that Godfrey actually committed the acts.

**{¶70}** At trial, the State postulated that Godfrey shot D.S. to retaliate either against a man known as "Lil E" in particular or against the Millvale neighborhood as a whole. "Lil E" was the half-brother of A.W., the intended target of the Westwood Northern shooting. The testimony at trial suggested that "Lil E" and Godfrey were embroiled in conflict after A.W. was shot. The electronic evidence also suggested that Godfrey believed someone shot at him the day after the Westwood Northern shooting on orders from "Lil E." The State therefore contended that, two days after the Westwood Northern shooting, Godfrey marched into Millvale, where "Lil E" resided, equipped with firearms and intent on exacting revenge.

**{¶71}** The evidence presented at trial was sufficient to support Godfrey's

---

[4] We do not address Godfrey's challenges to Millvale counts and specifications that were merged. *See Johnson*, 2021-Ohio-1321, at ¶ 12 (1st Dist.).

conviction for aggravated murder and possessing a weapon under disability. And, as we discuss, his convictions were not against the manifest weight of the evidence. To the contrary, the evidence presented at trial was consistent with the State's theory that the Millville shooting was a revenge killing.

### a. Tension mounts after A.W. is shot

**{¶72}** Officer Jason Bley was one of the officers who responded to the scene of the Westwood Northern shooting. Bley testified that "Lil E" arrived after the shooting and spoke to the officers. At some point, detectives learned that "Lil E" was the biological half-brother of shooting victim A.W. Best testified to messages exchanged between A.W. and Godfrey hours after the Westwood Northern shooting. In one message, Godfrey asked A.W. if he was telling people Godfrey tried to kill him. Thereafter, according to Best, Godfrey sent messages to Thomas, Gray, and others expressing his belief that "Lil E" put a hit out on him.

**{¶73}** Detectives Bill Hilbert and Ashley Jenkins were the lead investigators in the Millvale shooting. At trial, Jenkins testified to several chats sent the day after the Westwood Northern shooting, including several by Godfrey. Jenkins also testified to two videos subsequently extracted from Godfrey's Apple iPhone XR. One video depicted a white sedan that appeared to have blown-out windows and damage to the body. Another video depicted a person, whose face was not visible, pulling up his shirt and showing a small, superficial wound on his back. According to Jenkins, Godfrey followed those messages with the declaration, "E mine," ostensibly referencing "Lil E."

**{¶74}** Cell phone analyst Kepple testified to communications from Godfrey's phone to another individual around 11:00 p.m. the day after the Westwood Northern shooting. In these messages, Godfrey said he had been shot "in Lava." This was accompanied by the videos of the shot out white sedan and the superficial back wound,

after which Godfrey professed that "Lil E" was "his." In her testimony, Jenkins explained that "Lava" was slang for Millvale.

**{¶75}** The State further elicited evidence that Godfrey and "Lil E" sent numerous text messages the next day, February 18, in which they levied jeers and threats at one another. Among them was "Lil E's" taunt that Godfrey "[p]ull in Millvale." Godfrey professed his innocence in the shooting of A.W. whilst simultaneously goading "Lil E." The final text in that chain was sent at 4:09 p.m., four hours before the Millvale shooting. Thereafter, Godfrey sent selfie videos to several people showing him and Thomas walking outside in Millvale. Thomas overtly brandished a pistol, and Godfrey bore a large bulge under his jacket. The last of these videos was recorded around 6:05 p.m., roughly two hours before the Millvale shooting. The SpotShotter alert subsequently issued at 8:16 p.m.

### b. *The investigation into the Millvale shooting*

**{¶76}** Responding officer Cameron Mullis testified that, upon arrival at the apartment complex on Millvale Circle, officers located a man lying face down in the street. Mullis observed shell casings along the wall outside one of the apartment buildings as he walked the route the perpetrators appeared to have taken. Mullis also noticed fresh footprints in the snow in a cut-through area adjacent to a chain-link fence. Another officer testified that the route by the fence was a fairly steep shortcut through a wooded area commonly traversed by locals.

**{¶77}** Officer Steven Alexander was the criminalist who processed the Millvale shooting scene. Alexander identified and authenticated photographs depicting the scene as well as spent shell casings and fragments collected on site. The casings included 7.62 x 39 mm and 9 mm calibers, which were submitted to the lab for testing.

**{¶78}** Firearms examiner Chris Monturo of the Hamilton County Crime Lab

26

was admitted as an expert in the field of firearms and toolmark examination. Monturo testified that the lab received twenty 7.62 x 39 mm casings, three 9 mm casings, projectiles and fragments, and a Taurus model PT111 G2 pistol for analysis. Monturo determined that 17 of the 20 7.62 x 39 mm casings were fired from the same firearm. His findings on the remaining three casings were inconclusive. Monturo further determined that two of the three 9 mm casings were fired from the same firearm, while the third casing was not. He examined the Taurus pistol and determined that it did not fire any of the three 9 mm casings. Monturo explained that the 7.62 x 39 mm caliber round was typically a rifle cartridge, while the 9 mm round was typically a handgun cartridge.

{¶79} While on the witness stand, Monturo identified a video depicting Godfrey sitting in what appeared to be a residence, brandishing firearms before the camera. The prosecutor played the video in open court over defense objection. Monturo opined that the rifle displayed by Godfrey in the video was consistent with an AK-47 style rifle. He further opined that the rifle was the type of firearm capable of expelling the 7.62 x 39 mm rounds found at the scene of the Millvale shooting. Monturo confirmed that the magazine Godfrey showed to the camera at the end of the video was stocked with rounds that were consistent with 7.62 x 39 mm ammunition. On cross-examination, Monturo acknowledged that he could not say with any scientific certainty that the AK-47 wielded by Godfrey in the video was the weapon that discharged the ammunition collected at the scene of the Millvale shooting.

{¶80} Dr. Jennifer Schott, a deputy coroner, performed D.S.'s autopsy. She testified that D.S. died from a single gunshot wound to the head. Dr. Schott also observed blunt force injuries to the head and extremities and noted that D.S.'s tongue was lacerated at the tip. She opined that the injuries were consistent with D.S. falling

down face first. At trial, Dr. Schott identified a number of autopsy photographs depicting these injuries. The photographs showed D.S. to be a man of heavyset build.

**{¶81}** Detective Hilbert explained that the apartment complex on Millvale Circle was bounded by a fence. Adjacent to that fence was the wooded path that led to Webman Court, a nearby street that ran off Beekman Street. The detectives believed the shooters came up the wooded path and fired shots next to the building where most of the spent casings were found. Hilbert confirmed that no eyewitnesses to the shooting came forward.

### c. *Electronic evidence bolsters the State's case*

**{¶82}** The State's case was premised in large part on the text messages, chats, and data extracted from the Apple iPhone XR, the Apple iCloud backup, and the Bay Rue Facebook account. Jenkins was able to access the electronic communications complied in conjunction with the Westwood Northern investigation to aid her in the Millvale investigation. Based upon her investigation, Jenkins concluded that Godfrey and Thomas were suspects in the murder of D.S.

**{¶83}** At trial, Jenkins testified to a chat from February 17 in which Godfrey told Gray, "Lil E just tried to rock me." Jenkins identified a Facebook profile photo in which user "Ock Muhammad" posed by a vehicle and referred to himself as "Lil E." In another chat, as relayed by Jenkins at trial, Godfrey told Thomas, "They just tried to box me cuz." Jenkins explained that "box" was a slang for putting someone in a casket or killing them. Thomas asked who, and Godfrey replied, "Millvale N***as."

**{¶84}** Jenkins testified to another chat from February 17 in which Godfrey told someone listed as "Dick Head" in his contacts, "Y'all ain't Gone Ever Be Able to Come Outside In The Lava Ever Again." To reiterate, "Lava" was slang for Millvale. Godfrey continued, "Whoever outside out there from now on gone get [h]it" and "Somebody

ma[m]a finna be dressing up in all bla[c]k no cap!!!!"

{¶85} Jenkins testified to another series of communications from February 17 in which Godfrey told "Dick Head," "I'm bout to blow the lava up" and "[ ] I'm saying it's SOS." Jenkins opined that "SOS" meant "shoot on sight." The conversation continued with Godfrey declaring, "E Mine." In another message, according to Jenkins, Godfrey told "Dick Head," "everybody and I mean literally everybody kids and all can die in lava world and you know wassup." Godfrey continued, "Kids Mamas Daddy's Candy Lady's And All Millvale Done[.] On Our Grandma ima just sit back and watch."

{¶86} The State elicited testimony from Jenkins regarding a slew of messages exchanged between Godfrey and "Lil E" the next day, February 18. Again, according to Jenkins, Godfrey simultaneously proclaimed his innocence in the shooting of A.W. while taunting "Lil E." Godfrey averred he "was Wit P and Savage" and "was on the phone with Shiest the whole time." According to Jenkins's testimony, Godfrey then sent a string of unanswered messages coaxing "Lil E" to meet him on Beekman. Jenkins testified that "Lil E" replied by telling Godfrey he was an easy target. Godfrey cautioned, "If you ain't ready to die or go to jail stay out of millvale. Let's crash out then." Jenkins explained that "let's crash out" meant have a shootout. The final text in the chain was sent at 4:09 p.m.

{¶87} In a Facebook group chat initiated about an hour later, Godfrey told the group he was "Walking to millvale." Jenkins affirmed that the Apple iPhone XR seized from Godfrey during his arrest contained four videos recorded in the Beekman Street area. All four videos were created on February 18, the last being recorded at 6:05 p.m. Jenkins identified the persons depicted in the videos as Godfrey and Thomas.

{¶88} The videos were played for the jury. In the first video, Godfrey and

Thomas could be seen walking outside while Thomas displayed a pistol with an extended magazine. In the second and third videos, Godfrey and Thomas were again walking outside and Godfrey said, "They about to see who really reckless," and "We on Beekman walking to Millvale by ourselves." Based on what could be viewed in the background, Jenkins verified that the two young men were in the Beekman Street area walking toward Millvale. In the fourth video, Godfrey said he had a gun, panned the camera to show a large bulge under his jacket, insisted he was "a killer, 24/7," and touted himself and Thomas as "real killers."

{¶89} Jenkins testified that Godfrey sent a message to a person he addressed as "Angel," leading Jenkins to believe it was his girlfriend, Angelique Morris. The message included one of the videos of Godfrey and Thomas walking down Beekman Street, prompting Morris to ask, "Who you beefing with?" Godfrey replied, "Lil E." The message was sent at 7:15 p.m. on February 18, 2021, approximately one hour before the ShotSpotter alert occurred. According to Jenkins's testimony, Morris replied, "Omg" and Godfrey responded, "We bout to SPOTEM GOTTEM."

{¶90} The record also contains several incriminating messages sent on February 18 shortly after the murder of D.S. In these messages, Godfrey mentioned news reports on the Millvale shooting. Jenkins testified that, in a Facebook chat sent at 8:47 p.m., just 30 minutes after the shooting, Godfrey instructed Morris to screenshot the news app. Morris sent a screenshot of the Citizen News app bearing the heading, "Shots Fired 2174 Millvale Ct., Cincinnati." According to Jenkins, Morris sent two more screenshots from a Local 12 article reporting on the shooting death of a man in Millvale on Millvale Court. Godfrey responded, "Get it in blood."

{¶91} Jenkins testified to another series of messages from February 18 in which Gray and Godfrey discussed media reports about the Millvale shooting.

According to Jenkins, Gray indicated one report said no one was hit. Godfrey replied, "Duck [sic] that I watched Mfs fall literally face first." This was important because, as Jenkins reiterated in her trial testimony, Mullis's body-worn camera footage depicted D.S. lying face-down in the street when his body was first discovered. In addition, Dr. Schott testified that the injuries to D.S.'s body were consistent with having fallen down face first. Jenkins reaffirmed that no one had called 9-1-1 between the ShotSpotter alert and the time the police arrived on scene, meaning no details about the shooting had been released to the public. Thus, only individuals with first-hand knowledge of the shooting would know that D.S. died lying face-down.

{¶92} According to Jenkins's testimony, the chat between Gray and Godfrey continued with Godfrey telling Gray, "Somebody Hadda get hit they live in millvale." Godfrey continued, "It was a fat n***a." Jenkins reiterated in her testimony that D.S. was a heavyset man. Again, this further evinces that Godfrey had knowledge of express details about the killing that had not been made public.

{¶93} Jenkins testified to a chat in which Godfrey and Gray discussed the danger they were in and the need to lay low after the Millvale shooting. Gray clarified by asking if it was "From D.S. now?," but Godfrey replied that it was from A.W. Jenkins testified that Godfrey continued, "Our names out there now. Millvale beef with everybody. Bitch we known known now so that's gone open doors."

{¶94} Finally, cell phone analyst Kepple testified regarding his findings that implicated Godfrey in the Millvale shooting. Kepple testified to mapping the movements of Godfrey's phone from outside Millvale during the taunts exchanged with "Lil E." He then mapped activity on Godfrey's and Thomas's phones and opined that the data was consistent with the phones being together and their users traveling on foot toward Millvale. Kepple testified that the last recorded activity prior to the

31

shooting placed the phones at a distance of about two to three football fields from Millvale Circle. Thereafter, there was a 23-minute gap in the call detail records. Kepple testified that the gap indicated both phones were not operating on the system for that span of time. The gap could be explained by a number of things, according to Kepple. These included the possibility that the batteries for both phones died, both phones were put in airplane mode, both phones were out of the coverage area (which he opined was not likely under the circumstances), or both phones were powered off. Kepple noted that the SpotShotter notification went out in the same span of time in which both phones were not operating on the system.

{¶95} Considered in its totality, this direct and circumstantial evidence sufficiently and credibly established Godfrey's identity as the perpetrator of the Millvale shooting. Regarding sufficiency of the evidence, if we construe the evidence in favor of the State as required, the record contains ample evidence of identity. This evidence includes videos recovered from Godfrey's cell phone, Godfrey's text messages, cell phone data analysis, and officer testimony regarding "Lil E's" connection to a Westwood Northern shooting victim. Regarding manifest weight of the evidence, we cannot say the jury went astray in affording weight to the testimony of the State's witnesses which, if believed, provided abundant evidence establishing Godfrey's identity in relation to the Millvale shooting. We thus reject his sufficiency and weight challenges to the Millvale shooting convictions.

{¶96} Godfrey's third and fourth assignments of error are overruled.

### D. Severance

{¶97} In his fifth assignment of error, Godfrey argues that the trial court infringed upon his constitutional rights to due process and a fair trial by refusing to sever the charges pertaining to the Westwood Northern shooting from those

pertaining to the Millvale shooting.

{¶98} Godfrey preserved the issue by filing a motion to sever in advance of trial and renewing the motion at the close of the State's case. *Compare State v. Savage*, 2019-Ohio-4859, ¶ 18 (1st Dist.). We therefore review the trial court's denial of severance for an abuse of discretion. *State v. Chasteen*, 2024-Ohio-909, ¶ 27 (1st Dist.). An abuse of discretion occurs when "a court exercis[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. The abuse of discretion standard is highly deferential to the lower court. *State ex rel. Cincinnati Enquirer v. Hunter*, 2013-Ohio-5614, ¶ 29.

{¶99} Crim.R. 8(A) permits joinder of offenses in a single charging instrument where the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." The law favors joinder because it conserves public resources and encourages congruous legal outcomes. *State v. Torres*, 66 Ohio St.2d 340, 343 (1981).

{¶100} Even if offenses are properly joined under Crim.R. 8(A), a defendant may nonetheless move to sever them. Under Crim.R. 14, a trial court may afford relief from joinder where the defendant affirmatively demonstrates prejudice. *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980).

{¶101} The State can negate a claim of prejudicial joinder under Crim.R. 14 by showing (1) the evidence pertaining to the joined offenses could have been introduced in separate trials as other acts under Evid.R. 404(B), or (2) the evidence pertaining to each of the joined offenses is "simple and direct." *State v. Ford*, 2019-Ohio-4539, ¶ 104. The former has been referred to as the "other acts" test and the latter, the

"joinder" test. *See, e.g., State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). Because the two tests are disjunctive, the more stringent "other acts" test need not be met if the State can satisfy the "joinder" test. *State v. Rosemond*, 2019-Ohio-5356, ¶ 18 (1st Dist.), citing *Franklin* at 122; *State v. Gravely*, 2010-Ohio-3379, ¶ 38 (10th Dist.).

**{¶102}** Godfrey does not directly challenge the joinder of the Westwood Northern counts and the Millvale counts under Crim.R. 8(A). But to the extent he implies that the counts should not have been joined in a single indictment, he is incorrect. The State alleged that the two incidents were linked in a common course of criminal conduct, because the Millvale shooting occurred in response to what Godfrey perceived as retaliation for the Westwood Northern shooting. The counts were therefore properly joined under Crim.R. 8(A).

**{¶103}** Godfrey more directly challenges the trial court's denial of his motion to sever the two sets of counts under Crim.R. 14. In particular, he maintains that he was prejudiced by the trial court's refusal to sever the charges because the proof was complex and because the jury was likely to be confused. In particular, Godfrey points to the hours of testimony in which witnesses read text messages and chats to the jury. He claims that because it was difficult to determine which messages applied to which shooting, the jury likely rendered guilty findings on one set of offenses based on evidence from the other. He argues that this establishes prejudice.

**{¶104}** Godfrey's position as to prejudice ignores the application of the "joinder test," which negated any prejudice he might have suffered from the Westwood Northern counts and the Millvale counts being tried together. It is true that the State's case involved the presentation of electronic communications and numerous lay and law enforcement witnesses over a lengthy trial. But the evidence of each offense was direct and uncomplicated. *See State v. Echols*, 128 Ohio App.3d 677, 694 (1st Dist.

1998).

{¶105} At trial, the State established that there were two separate shootings, on two different dates, at two different locations, involving different victims. *See, e.g.,* *State v. Hurt*, 2024-Ohio-3115, ¶ 77 (1st Dist.), citing *State v. Decker*, 88 Ohio App.3d 544, 549 (1st Dist. 1993) ("The factual situation of each crime charged was easy to understand and was capable of segregation since the crimes charged involved different victims, different factual scenarios and different witnesses."). The State called witnesses to testify to the Westwood Northern shooting first and the Millvale shooting second. This largely chronological presentation made the evidence orderly and digestible for the jury. Thus, the evidence, while voluminous and detailed, was capable of being segregated by the trier of fact. *See Echols* at 694 (providing, "if the evidence of each offense is direct and uncomplicated, it is presumed that the trier of fact is capable of segregating the proof and not cumulating evidence of the various offenses being tried"). Under these circumstances, we cannot say that the trial court erred in denying Godfrey's motion to sever.

{¶106} Godfrey's fifth assignment of error is overruled.

### E. Ineffective Assistance of Counsel

{¶107} In his sixth assignment of error, Godfrey claims he received ineffective assistance of counsel because his attorneys failed to cross-examine what he deems "a large number of key witnesses." It is true that defense counsel did not question a number of the 25 witnesses called to testify on behalf of the State. These include Officer Comes, Officer Bley, Sergeant Clarkson, Detective Karaguleff, and R.L., a civilian eyewitness, all of whom testified about the Westwood Northern shooting.

{¶108} Criminal defendants are entitled to the effective assistance of counsel under both the United States and Ohio Constitutions. *State v. Solorio*, 2022-Ohio-

3749, ¶ 33 (1st Dist.), quoting *State v. Evick*, 2020-Ohio-3072, ¶ 45 (12th Dist.); U.S. Const., amend. VI; Ohio Const., art. I, § 10. Trial counsel will not be considered ineffective unless (1) counsel's performance was deficient and (2) the defendant suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

**{¶109}** Deficient performance is that which falls below an objective standard of reasonableness. *Strickland* at 687-688. Likewise, a defendant is prejudiced by counsel's performance only if there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Id.* at 694.

**{¶110}** Godfrey identifies specific areas of cross-examination he thinks his attorneys should have pursued. For Comes, this was the conditions at the site of the shooting. For Clarkson, this was his conclusions after speaking with M.F. For Bley, this was his conversation with "Lil E." For R.L., this was a more detailed description of who he saw run to the Chevy Trailblazer after hearing gunshots. For Karaguleff, this was his conversation with Gray in Mississippi. Godfrey contends these areas of cross-examination would have cast doubt on the State's case. But Godfrey cannot demonstrate that he was prejudiced by his attorneys' failure to question these witnesses on these subjects. Anything of value that the witnesses might have produced in favor of the defense is purely speculative at this stage of the proceedings. *See State v. Short*, 2011-Ohio-3641, ¶ 119. We simply do not know what they would have said, and that is fatal to Godfrey's ineffectiveness claim.

**{¶111}** Moreover, counsel's failure to cross-examine the five named witnesses did not amount to the abdication of a meaningful adversarial challenge, as was the case in *Grosclose v. Bell*, 130 F.3d 1161 (6th Cir. 1997). In *Grosclose*, the Sixth Circuit Court of Appeals concluded that the defendant was deprived of the effective assistance

of counsel because defense counsel essentially abandoned his responsibility to defend the accused. *Id.* at 1162. The court described the attorney's performance as follows:

> During the guilt phase of the trial, [counsel] failed to call a single witness or put on any proof, and, further, advised Groseclose not to testify, despite his lack of a criminal record and despite the fact that he had consistently maintained his innocence. [Counsel] made one independent objection in the course of the 2400-page transcript. He cross-examined fewer than half of the State's 39 witnesses; his cross-examination of Mount, perhaps the most crucial witness for the State, consisted of a total of 11 pages of transcript. And after failing to present the jury with any evidence on his client's behalf, [counsel] culminated his performance by waiving his closing argument.

*Id.* at 1166 (relaying the district court's findings, which were ultimately upheld).

{¶112} Godfrey's case is readily distinguishable from *Grosclose*, in that Godfrey's attorneys did not wholly abdicate their defense role. Rather, counsel chose to forego cross-examination of just a small number of the prosecution's witnesses. We cannot say that this decision, in and of itself, was so deleterious to Godfrey's ability to defend himself that it constituted per se prejudice.

{¶113} Godfrey's sixth assignment of error is accordingly overruled.

### F. Prejudicial Photographs and Videos

{¶114} In his seventh assignment of error, Godfrey argues that the trial court abused its discretion under Evid.R. 403(A) by admitting photographs and videos that depicted him holding firearms. Specifically, he challenges the admission of the video firearms examiner Monturo discussed during his testimony as showing Godfrey with an AK-47 style assault rifle and a handgun. We review a trial court's decision to admit

evidence for an abuse of discretion. *State v. Terry*, 2023-Ohio-3131, ¶ 6 (1st Dist.).

**{¶115}** Typically, "evidence of dangerous weapons, even though found in the defendant's possession, must be excluded when they are not relevant to the crimes charged and lead only to improper inferences about the defendant's character." *State v. Gatewood*, 2021-Ohio-3325, ¶ 31 (1st Dist.), citing *State v. Thomas*, 2017-Ohio-8011, ¶ 36, 41. This is because Evid.R. 403(A) mandates exclusion of evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *State v. Hartman*, 2020-Ohio-4440, ¶ 29-30.

**{¶116}** At trial, the prosecution argued that the video was relevant and admissible because it depicted weapons that were similar to those used in the Millvale shooting. Defense counsel objected to the admission of the video on the grounds that it was highly prejudicial. The trial court acknowledged the prejudicial nature of the video, but ruled that it was relevant and that the jury could assess its weight.

**{¶117}** We agree with the trial court's determination that the video was relevant. *See* Evid.R. 401 and 402. Citing Evid.R. 403(A), Godfrey nonetheless maintains that the video was subject to exclusion due to its inflammatory nature. He insists the footage was introduced merely to inspire fear in the jurors. And he highlights the lack of evidence that the firearms in the video were used in the Millvale shooting. While the video was undoubtedly prejudicial, it demonstrated Godfrey's familiarity with and access to the types of firearms used in the Millvale shooting. "A trial court does not abuse its discretion in admitting a photograph of the defendant with a gun where a witness testifies that a similar gun was used in the commission of the crime." *State v. Patterson*, 2018-Ohio-3348, ¶ 16 (1st Dist.). The video met this standard.

{¶118} In the video, Godfrey could be seen holding a magazine that firearms examiner Monturo identified as being stocked with what appeared to be 7.62 x 39 mm rounds and an assault rifle that Monturo identified as being consistent with an AK-47 style rifle. Both 7.62 x 39 mm and 9 mm casings were collected from the Millvale scene. The fact that Monturo could not definitively testify that the rifle in the video was the murder weapon more appropriately concerns the weight the jury should have accorded the evidence rather than admissibility. *See, e.g., State v. Harris*, 2006-Ohio-3520, ¶ 89-92 (7th Dist.) (rejecting argument that gun clip recovered from common area of defendant's home should have been excluded because prosecution did not prove it belonged to defendant or was used in the murder).

{¶119} On this record, we decline to hold that the trial court abused its discretion in finding the video more probative than prejudicial. Godfrey's seventh assignment of error is overruled.

### G. Sentencing

{¶120} In his eighth and ninth assignments of error, Godfrey argues that he is entitled to resentencing because the trial court's sentences for aggravated murder constitute cruel and unusual punishment. He further argues that consecutive sentences were improper where the activity underlying the two aggravated murder convictions was committed within a continuing course of conduct. Godfrey also claims that he is entitled to resentencing because the trial court's judgment entry does not accurately reflect the sentence announced in open court. We disagree.

{¶121} The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishments. Criminal sentences which violate this prohibition "are limited to those . . . [that] would be considered shocking to any reasonable person," and "the penalty must be so greatly disproportionate to the offense as to shock

the sense of justice of the community." *State v. Hairston*, 2008-Ohio-2338, ¶ 14. "Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Id.* at ¶ 20. Generally speaking, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment. *Id.* at ¶ 21.

{¶122} Pursuant to R.C. 2953.08(G)(2), a reviewing court may modify or vacate a felony sentence only if it finds by clear and convincing evidence that the record does not support the trial court's findings or the sentence is otherwise contrary to law. *State v. Jones*, 2024-Ohio-1083, ¶ 13. Here, the trial court imposed an aggregate sentence of two terms of life imprisonment without the possibility of parole plus 25 to 29 years. Godfrey does not deny that each of the individual terms fell within the authorized statutory range. Rather, he claims the consecutive nature of the sentences on the two aggravated murder counts violates the prohibition against cruel and unusual punishment because the shootings were committed in a continuous course of conduct. Godfrey cites R.C. 2929.14(D)(1)(b) in support of this argument. No such subsection exists in the version of the felony sentencing statute in place at the time of Godfrey's sentencing. Moreover, subsection (D) concerns postrelease control, not imprisonment. Godfrey therefore fails to provide any statutory support for his argument.

{¶123} Godfrey correctly asserts that there is a general presumption in favor of concurrent service of prison terms in Ohio law. *See State v. Bonnell*, 2014-Ohio-3177, ¶ 23; R.C. 2929.41(A). In order to deviate from this presumption and justify consecutive sentences, the trial court must make the findings outlined in R.C. 2929.14(C)(4). Specifically, the court must find that (1) consecutive sentences are

necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) at least one of the three findings set forth in R.C. 2929.14(C)(4)(a)-(c) applies. *State v. Beasley*, 2018-Ohio-493, ¶ 252.

{¶124} Here, the trial court recited the requisite consecutive sentence findings at the sentencing hearing and incorporated those findings into the judgment entry of conviction and sentence. *See Bonnell* at ¶ 29. Furthermore, the record supports the court's findings. *See State v. Gwynne*, 2023-Ohio-3851, ¶ 17-18. At sentencing, the court indicated it had reviewed the presentence investigation report, including Godfrey's lengthy criminal record, most of which occurred while he was a juvenile. The court noted that Godfrey's criminal acts included violent offenses and that his conduct appeared to worsen despite attempts at rehabilitation. The trial court considered that Godfrey was out on bond when the offenses were committed and had been to prison as an adult. Finally, the trial court noted that Godfrey acted with forethought in the shootings and exhibited no remorse. On this record, we cannot say that Godfrey's aggregate prison term, which resulted from the consecutive imposition of the individual sentences, violates the Eighth Amendment prohibition against cruel and unusual punishment.

{¶125} Godfrey also argues that the trial court erred by failing to include language in its judgment entry that its sentence on Godfrey's firearm specifications must be served prior and consecutively to its sentence on the aggravated murder counts. The trial court correctly advised Godfrey at the sentencing hearing of the requirement set forth in R.C. 2929.14(C)(1)(a) that he first serve his sentence on the firearm specifications. But it aggregated the specification sentences in the judgment

entry, sentencing Godfrey to a total sentence of two life terms without the possibility of parole plus 25 to 29 years.

{¶126} Numerous Ohio appellate courts have acknowledged that challenges to "sentences imposed consecutively to life-without-parole sentences are moot because the issue is 'academic'—this court can issue no decision that will have any practical effect on the controversy." *State v. Herrington*, 2018-Ohio-3049, ¶ 35 (8th Dist.); *see State v. Austin*, 2019-Ohio-1185, ¶ 90 (7th Dist.); *State v. Mack*, 2023-Ohio-4374, ¶ 80 (11th Dist.). That is because, practically speaking, "[t]he defendant can only be subjected to living out his or her life in prison once." *State v. Chavez*, 2013-Ohio-4700, ¶ 47 (8th Dist.). We therefore see no reversible error in the trial court's judgment entry with regard to the order in which he serves the sentences.

{¶127} Finally, Godfrey notes that he entered guilty pleas to Counts 1 and 9, which pertained to the unrelated murder of J.C. and which the trial court severed from the Westwood Northern and Millvale counts.[5] He faults the trial court for entering a separate judgment entry on Counts 1 and 9, which it entered in the case numbered B-2101673-A—the same case under appeal in this proceeding. He insists all counts in the indictment—the Westwood Northern counts, the Millvale counts, and the J.C.-related counts–should be disposed of in a single judgment entry. We reject this proposition.

{¶128} Godfrey did not file a notice of appeal from the judgment entry resolving Counts 1 through 9. As a result, that judgment is not before us. *See State v. Hamberg*, 2015-Ohio-5074, ¶ 8 (1st Dist.), citing *State ex rel. Curran v. Brookes*, 142 Ohio St.

---

[5] Godfrey's brief indicates he "pled separately on Counts 1 to 10 after trial[.]" While these counts all concern the murder of J.C., only Counts 1 through 9 were levied against Godfrey. Count 10 levied a charge of having weapons while under disability against Gray.

107 (1943), paragraph seven of the syllabus; *see also* App.R. 4(A). But even if it were, the one-document rule would not apply. *Compare State v. Baker*, 2008-Ohio-3330, ¶ 17 (holding that the elements for a judgment of conviction required by Crim.R. 32(C) must be housed in a single entry as only one document can constitute a final, appealable order). Severed counts may be resolved on different timelines which may, in turn, require separate judgment entries. *See State v. Morris*, 2024-Ohio-262, ¶ 13-17 (10th Dist.), discussing *State v. Craig*, 2020-Ohio-455. Under such circumstances, each entry constitutes a final, appealable order in its own right. *See id.* at ¶ 17.

**{¶129}** Godfrey's eighth and ninth assignments of error are overruled.

### *Analysis of the J.S. Appeal*

**{¶130}** J.S. raises a single assignment of error on appeal. She argues that the trial court erred in failing to order that Godfrey pay restitution in violation of her statutory and constitutional rights as a victim of Godfrey's offenses. Godfrey concedes that the trial court erred in failing to consider the issue of restitution at sentencing.

**{¶131}** Under R.C. 2929.18(A)(1), a trial court may order restitution to the victim of a felony offense in an amount that does not exceed the victim's economic loss. *State v. Lalain*, 2013-Ohio-3093, ¶ 3. In addition, Marsy's Law affords crime victims the state constitutional right to "full and timely restitution from the person who committed the criminal offense or delinquent act[.]" Ohio Const., art. I, § 10a(A)(7). *See State v. Fisk*, 2022-Ohio-4435, ¶ 11. For purposes of Marsy's Law, a "victim" is "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act." Ohio Const., art. I, § 10a(D). Victims have a right to appeal the issue of restitution. Ohio Const., art. I, § 10a(B). To preserve the issue for appeal, either the State or the victim must request restitution before the trial court. *See id.*; *see also State v. Brasher*,

2022-Ohio-4703, ¶ 16-26.

**{¶132}** J.S. is the mother of D.S., the deceased victim of the Millvale shooting. She meets the constitutional definition of a victim as defined by Marsy's Law. The record indicates that J.S. submitted a victim impact statement and invoices for burial expenses in advance of sentencing and that she appeared at the sentencing hearing.

**{¶133}** The prosecutor made a request for restitution on the record on J.S.'s behalf. The trial court denied the request outright, without considering the invoices J.S. submitted and without taking evidence as to the amount of restitution. In doing so it opined that, despite its desire to award restitution, the law prohibited such an award because Godfrey was going to prison. This was in error.

**{¶134}** "[T]he fact that a defendant is sentenced to a lengthy prison sentence 'does not necessarily preclude the imposition of financial sanctions.'" *State v. Nitsche*, 2016-Ohio-3170, ¶ 76 (8th Dist.), quoting *State v. Western*, 2015-Ohio-627, ¶ 57 (2d Dist.); *State v. Fischer*, 2013-Ohio-4817, ¶ 21 (2d Dist.) (affirming restitution order in the amount of $6,025.18, imposed upon a defendant serving a 50-year prison sentence); *State v. Harwell*, 2015-Ohio-2966, ¶ 67-71 (2d Dist.) (holding that trial court did not commit plain error when it ordered defendant sentenced to 32 years to life in prison to pay restitution in the amount of $3,891.65).

**{¶135}** We accordingly sustain J.S.'s sole assignment of error and remand the matter to the trial court for a hearing on J.S.'s request for restitution.

### *Conclusion*

**{¶136}** After thoroughly reviewing the lengthy record in this case, we overrule Godfrey's assignments of error and affirm the trial court's judgment as to his convictions and terms of imprisonment. As to J.S.'s appeal, we sustain her sole assignment of error and remand the cause for a restitution hearing.

Judgment accordingly.

**ZAYAS** and **MOORE, JJ.,** concur.